**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Jason Waters and All Weather Industries of NY Inc. d/b/a/ Wetherall Carting,<br><br>Plaintiffs,<br><br>-and-<br><br>The Village of Saltaire,<br><br>Plaintiff-Intervenor,<br><br>-v-<br><br>National Park Service; Douglas Burgum, in his official capacity as Secretary of the United States Department of the Interior; and Alexcy Romero, in his official capacity as Superintendent of the Fire Island National Seashore,<br><br>Defendants. | 2:25-cv-564<br>(NJC) (ARL) |

## OPINION AND ORDER

NUSRAT J. CHOUDHURY, United States District Judge:

This action concerns federal regulation of the transportation and disposal of construction debris from the Village of Saltaire on Fire Island. Plaintiffs Jason Waters and All Weather Industries of New York Inc. d/b/a Wetherall Carting ("Wetherall Carting," and together the "Wetherall Plaintiffs"),[1] commenced this action on January 31, 2025, against the National Park Service ("NPS"), Debra Haaland, in her official capacity as Secretary of the United States Department of the Interior (the "Secretary"), and Alexcy Romero, in his official capacity as

[1] There are various spellings of Wetherall in the record. The Wetherall Plaintiffs' Amended Complaint, which is the operative pleading, uses "Wetherall." Accordingly, I use that spelling to refer to Plaintiffs Wetherall Carting and Barry Wetherall.

Superintendent of the Fire Island National Seashore (the "Superintendent"). (Wetherall Compl., ECF No. 1.) The Wetherall Plaintiffs filed an Amended Complaint bringing claims under: (1) the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq.; (2) 42 U.S.C. § 1983 for alleged violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution; and (3) New York common law for tortious interference with contract and prospective economic advantage. (Wetherall Am. Comp., ECF No. 25.) They also seek a writ of mandamus pursuant to 28 U.S.C. § 1361. (*Id.*) Pursuant to Fed. R. Civ. P. 25(d), Douglas Burgum, the current Secretary of the Interior, is automatically substituted for former Secretary Haaland as a Defendant in this action. *See* Fed. R. Civ. P. 25(d).

This Court granted a motion to intervene by the Village of Saltaire (the "Village," and together with the Wetherall Plaintiffs, "Plaintiffs"), which brings separate claims from those of the Wetherall Plaintiffs. (Min. Entry, Feb. 7, 2025; *see* Village Compl., ECF No. 21.) The Village brings several APA claims challenging the Superintendent's issuance of letters to Village Mayor Hugh O'Brien on December 20, 2024 (the "December 20, 2024 Determination") and January 7, 2025 (the "January 7, 2025 Determination" and together, the "Original Determinations") and the factual findings and interpretations set forth in them. (Village's Am. Compl., ECF No. 35.) The Village alleges that the Superintendent issued the Original Determinations (1) in excess of Defendants' rulemaking authority under the Fire Island National Seashore Act (the "FINS Act"), 16 U.S.C. § 459e; (2) in excess of Defendants' authority under the regulations governing the permitting of motor vehicles on the Fire Island National Seashore ("FINS"), 36 C.F.R. § 7.20; and (3) in violation of the notice and comment requirements of the APA, 5 U.S.C. § 553; and (4) in violation of the procedural requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4371–75. (*Id.*) It further alleges that the

Original Determinations contain factual findings and interpretations of 36 C.F.R. § 7.20 and terms used in permits issued to the Wetherall Plaintiffs under the regulation—which are known as "Essential Service Permits"—that are arbitrary, capricious, and contrary to law in violation of the APA, 5 U.S.C. § 706. (Village's Am. Compl. ¶¶ 158–162.)

Before me are the parties' fully briefed cross-motions for summary judgment under Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.").[2] Plaintiffs argue that, based on the administrative record, they merit summary judgment on all of their claims. Defendants contend that the Court lacks subject matter jurisdiction because all claims are moot in light of the Superintendent's issuance of a July 23, 2025 letter (the "Subsequent Determination") less than two weeks prior to their deadline to file their cross-motion for summary judgment and opposition to Plaintiffs' motion. In the alternative, Defendants argue that, based on the administrative record, all claims must be denied on the merits.

For the reasons explained below, Plaintiffs' claims are not moot. Defendants fail to meet the high bar required under the voluntary cessation doctrine to show that it is absolutely clear that the challenged factual findings and agency interpretations set forth in the Original Determinations are not reasonably expected to recur. The Superintendent's issuance of the Subsequent Determination in the course of briefing on the cross-motions for summary judgment establishes only that, *going forward*, the interpretation that construction debris is included in the meaning of the term "municipal solid waste" as used in any current Essential Services Permits (including the Wetherall Plaintiffs' 2025 Essential Service Permits), any future permits, and the

[2] Pls.' Not. Mot., ECF No. 46; Pls.' Mem. L. Supp. Mot. Sum. J. ("Wetherall Mem."), ECF No. 45; Village's Not. Mot. ECF No. 44; Village's Mem. L. Supp. Mot. Sum. J. ("Village's Mem."), ECF No. 44-4; Defs.' Mem. L. in Opp'n & Supp. Sum. J. ("Defs.' Mem."), ECF No. 51-1.

corresponding interpretation of the term "[s]anitation or refuse" in 36 C.F.R. § 7.20(a)(1)(x). However, the Subsequent Determination does *not* rescind the Superintendent's factual findings set forth in both Original Determinations that construction waste can be removed by waterborne transportation. Nor does it alter the Superintendent's implied interpretation of 36 C.F.R. § 7.20(a)(1)(x) set forth in the Original Determinations and corresponding text in the Wetherall Plaintiffs' 2024 Essential Service Permits, which interpreted the term "municipal solid waste" to exclude "construction debris" and immediately prohibited the Wetherall Plaintiffs from carting construction debris over Seashore lands. Nor have Defendants demonstrated that all of the consequences of those challenged agency findings and interpretations have been completely and irrevocably eradicated because the Subsequent Determination does not rescind or alter these specific factual findings or interpretations. Accordingly, the voluntary cessation doctrine does not apply, and Defendants' mootness argument fails.

Regarding the merits, summary judgement is granted to Defendants in part and to Plaintiffs in part as follows. First, Defendants are granted summary judgment with respect to the Village's claim that Defendants exceeded their statutory authority in issuing the Original Determinations, which prohibited the removal of construction debris by vehicle across the FINS Roadway and defined the "municipal solid waste" that may be transported over the FINS pursuant to the 2024 Essential Service Permits to exclude "construction debris." Rather, through the Organic Act, Congress delegated to the Secretary, acting through the Director of the National Park Service, the authority to make rules regulating motor vehicle travel on the FINS. 54 U.S.C. § 100101(a). Accordingly, the Superintendent issued the Original Determinations pursuant to regulations promulgated under the National Park Service's broad authority to "prescribe such regulations as the Secretary considers *necessary or proper for the use* and management of

System units," 54 U.S.C. § 100751(a) (emphasis added). The Superintendent has authority to regulate motor vehicle traffic, including the transportation of construction debris by truck in order to minimize the potential degenerative impact of such traffic on the Fire Island National Seashore. As a result, the Secretary did not exceed his authority under the Organic Act in issuing the Original Determinations.

Second, the record establishes that the Original Determinations set forth arbitrary and capricious factual findings and interpretations of 36 C.F.R. § 7.20 and corresponding text in the 2024 Essential Service Permits issued to the Wetherall Plaintiffs according to which permit holders are prohibited from transporting construction debris over the FINS Roadway. There are three specific arbitrary and capricious components of the Original Determinations: 1) the factual findings that "construction waste can be removed by waterborne transportation"; 2) the Superintendent's interpretation that the "[s]anitation or refuse" authorized for removal by truck over the FINS Roadway pursuant to 36 C.F.R. § 7.20(a)(1)(x) and the corresponding understanding of the term "municipal solid waste" in the Wetherall Plaintiffs' 2024 Essential Service Permits excludes "construction debris"; and 3) the immediate prohibition on the removal of construction debris from the Village by any means other than waterborne transportation as set forth in the Original Determinations and the 2024 Essential Service Permits. These findings, interpretations, and prohibitions are arbitrary and capricious because the Superintendent made them without ever considering Plaintiffs' reliance interests or weighing any such interests against competing policy concerns. In addition, Defendants fail to demonstrate that they made any findings to support the factual determination that the Village can remove construction debris from Fire Island by barge, despite evidence in the record to the contrary.

Third, Defendants meet their burden to secure summary judgment on Plaintiffs' remaining APA claims. Plaintiffs argue that the Original Determinations were not issued in accordance with law and failed to comply with the APA's notice and comment requirements. However, the text of the FINS regulation, 36 C.F.R. § 7.20(a)(1)(x), (4), (5)(iii), (6), plainly provides the Secretary with authority to regulate the operation of motor vehicles on Fire Island through the issuance of permits, including Essential Service Permits. Moreover, Plaintiffs fail to show that the Original Determinations are legislative rules that may only be enacted after notice and comment. Accordingly, Defendants are granted summary judgment on Plaintiffs' remaining APA claims.

Finally, summary judgment is denied to both parties on the Village's NEPA claim. Plaintiffs contend that the Original Determinations are subject to NEPA's rules concerning the preparation of an environmental impact assessment. However, they do not demonstrate that the Original Determinations constitute a major federal action requiring an environmental impact assessment under NEPA. Defendants misinterpret the NEPA claim as advancing arguments that Plaintiffs expressly disavow, and thus fail to adequately respond to the claim. Therefore, neither party has shown entitlement to summary judgment on the NEPA claim.

Accordingly, for all of these reasons and as discussed in more detail below, I vacate the Original Determinations in their entirety as well as Defendants' corresponding interpretations of the term "municipal solid waste" used in the Wetherall Plaintiffs' 2024 Essential Service Permits and the term "[s]anitation or refuse" in 36 C.F.R. § 7.20(a)(1)(x) as applied to the 2024 Essential Service Permits. Under the APA, 5 U.S.C. § 706(2)(A), such arbitrary and capricious agency action is unlawful and set aside. However, the parties failed to adequately address remedy in

their submissions. Therefore, all other relief requested by Plaintiffs is denied without prejudice and subject to further submissions as detailed below.

## BACKGROUND

### I. The Village of Saltaire

The Village is one of seventeen communities located on Fire Island, a narrow barrier island, located off the south coast of Long Island in Suffolk County, New York. (FINS Alternative Transportation Study (the "Volpe Study"), Administrative Record ("AR.") 216–296, ECF No. 42.) It is comprised of approximately 425 residential homes and has a population of 33 year-round-residents and an estimated 3,000 seasonal residents and guests. (June 18, 2025 Decl. of Mario Posillico ("First Posillico Decl.") ¶¶ 4, 16, ECF No. 44-1.) Access to the Village is available only by ferry or by traveling by foot, bike, or motor vehicle across a designated off-road route known as the "FINS Roadway" through protected federal land known as the Fire Island National Seashore (the "Seashore"). First Posillico Decl. ¶ 3; 16 U.S.C. § 459e; 36 C.F.R. § 7.20(a); *Friends of Animals v. Fellner*, No. 16-cv-6006, 2018 WL 11432021, at *1 (E.D.N.Y. July 24, 2018) (describing Seashore lands), *aff'd sub nom. Friends of Animals v. Romero*, 948 F.3d 579 (2d Cir. 2020).[3]

Wetherall Carting, through its owner, Waters, and Waters' predecessor, has contracted with the Village since 1969 to dispose of its incombustible sanitation and refuse, including construction debris. (First Posillico Decl. ¶ 3(b).) During this entire time period, Wetherall Carting has trucked or carted all of the Village's incombustible sanitation off of Fire Island by driving it over the FINS Roadway. (First Posillico Decl. ¶ 3(a)–(b).) Since the end of 2006, when

[3] Unless otherwise indicated, case quotations omit all internal quotation marks, alterations, brackets, and citations.

the Village decommissioned its incinerator, Wetherall Carting has also removed the Village's combustible sanitation and refuse from Fire Island by carting it over the FINS Roadway. (*Id.* ¶ 3(c).)

Posillico attests that in 2024, construction debris comprised around 70% of the Village's waste and that such debris is the result of the "significant reconstruction and repair work on homes, walks and other structures and infrastructure that occurs in the Village each year." (*Id.* ¶¶ 13, 15.) The Village has never disposed of any sanitation or refuse by transporting it off of Fire Island by barge over water. (*Id.* ¶ 3(d).)

## II. The Volpe Study

In December 2011, the Volpe Center at the U.S. Department of Transportation prepared for the National Park Service a report titled, "Fire Island National Seashore: Alternative Transportation Study." (*See* Volpe Study, AR. 216–296.) Village Administrator Mario Posillico attests that, "to the best of [his] recollection," the Volpe Study was never provided to the Village, presented to the public, or the subject of public comment or meetings. (Posillico ¶ 3(e).) Posillico attests that the Village saw the study for the first time during this litigation. (*Id.*) According to the Volpe Study, it was prepared as part of a General Management Plan ("GMP") process undertaken by a government agency, the FINS, to protect Fire Island's resources and to update and replace the then-existing GMP, which was written in 1977. (AR. 220.) The primary focus of the Volpe Study is the "best and most appropriate methods for moving people, goods, and services to, from, and along Fire Island." (*Id.*)

Some of the study's findings are not in dispute. These include the finding that, as of 2011, "[m]ost community docks [on Fire Island were] not equipped to handle garbage transfer by barge" because this method of transport first requires moving a dumpster filled with garbage

onto the barge and then, "garbage and debris has to be transferred to the dock by vehicle . . . then transferred to the boat, then transferred back to a vehicle once on Long Island." (AR. 269–70.) Moreover, those Fire Island communities "with capacity to handle heavy equipment have expressed reluctance or unwillingness to allow other communities to use their facilities." (AR. 254.) The Volpe Study found that, given these challenges, "the removal of debris from [Fire Island] is generally done by vehicle" and "[t]he nature of *construction debris* makes it very difficult to transfer between multiple travel modes." (AR. 270 (emphasis added).) Indeed, the study reported that "[contractors] say that it is unfeasible to transfer debris by boat . . . ." (AR. 283.) The Volpe Study sets out the following long term objectives: (1) that "[m]ost communities have docks that are capable of garbage hauling and those that do not pay a fee to have their garbage hauled by land to a neighboring dock; and (2) although "it may be impractical to haul some types of debris off-Island by boat . . . the general idea is to maximize boat haulage and minimize vehicle use and negative effects . . . ." (*Id.*)

By contrast, certain findings in the Volpe Study concerning the Village's docking capabilities are disputed. The study found that, as of 2011, the Village had recently completed renovations to its dock "that allow it to offload vehicles and other heavy equipment," including "vehicles and *construction equipment* needed for major repairs on the Island." (AR. 254 (emphasis added).) It also found that the Village was one of several communities that had "separate docks or separate areas of [its] marina to accommodate freight," thereby allowing "docks to handle both food deliveries and *garbage hauling*" notwithstanding a New York State law prohibiting "garbage hauling [from using] the same facilities as food delivery." (*Id.*) However, the Volpe Study also found that "most walks in the Village cannot accommodate" heavy equipment and that the Village's "long-term goal of hauling construction off of the Island

by barge . . . cannot be realized until Broadway (the main north-south walk) is restructured, which may be many years away." (*Id.*) Moreover, although the study includes findings with respect to the Village dock's capabilities to barge *construction equipment*, it does not address the feasibility of moving *construction debris* by barge. The Volpe Study also does not explain how it arrived at its findings with respect to the Village dock.

Posillico agrees with the Volpe Study's findings that "walks in the Village cannot accommodate" heavy equipment, but he disputes the remaining findings regarding the capabilities of the Village dock. (First Posillico Decl. ¶ 51.) He attests that the upgrades to the Village's dock referenced in the Volpe Study were made to provide a "safe dock for passengers and light freight deliveries," not for garbage and construction debris. (*Id.* ¶¶ 43, 44.) He explains that the Village's only dock with ferry service is meant to accommodate the 55,000 to 60,000 passengers who travel to and from the Village each year and to receive food deliveries and "deliveries of goods and light freight . . . such as appliances, supermarket purchases . . . [and] building materials, such as lumber, shingles or similar materials." (*Id.* ¶¶ 23, 29.) It "was not designed to and is unable to safely accommodate garbage or dumpsters . . . and there is no place in the area of the pier . . . where waste and debris could be stored, staged, or transferred or loaded or unloaded to and from trucks and boats" in light of New York law prohibiting the use of the same facilities for both garbage hauling and food delivery. (*Id.* ¶¶ 25, 27.) Posillico further attests that even if the Village's dock were capable of barging construction debris, "it would rapidly deteriorate under such extensive usage" because such an operation would require bearing "an estimated 1,750,000 pounds of construction debris alone on an annual basis." (*Id.* ¶ 28.) Such an operation would also require "years of work and extensive and difficult approvals, studies, public processes and permitting, none of which is guaranteed to be granted." (*Id.* ¶ 38.)

### III. Essential Service Permits

To minimize the impact of motor vehicles, seaplanes, and personal watercraft on Seashore lands and nearby waters, the NPS regulates the operation of these vehicles under 36 C.F.R. § 7.20 (“Section 7.20”). The FINS is a “unit” of NPS and the government agency responsible for conserving and preserving Seashore lands and enforcing Section 7.20. *D’Arienzo v. Fire Island Nat’l Seashore*, No. 20-cv-6330, 2024 WL 36983, at *1 (E.D.N.Y. Jan. 3, 2024).

Pursuant to Section 7.20, “[n]o motor vehicle . . . shall be operated on Seashore lands without a valid permit issued by the Superintendent,” and the Superintendent “may limit the total number of permits for motor vehicle travel on Seashore lands” and may “limit the number of permits issued for each category of eligible applicants . . . as the Superintendent deems necessary for resource protection, public safety, or visitor enjoyment.” 36 C.F.R. §§ 7.20(a)(4), (8). Even for permit holders, “travel across Seashore lands” is authorized “only on those days in which the island location . . . is not served by alternative transportation,” unless the vehicle is a public utility, service, or official vehicle, and the Superintendent has determined that “travel by such vehicles is essential, notwithstanding” this limitation. *Id.* § 7.20(a)(10)(i), (v). The term “alternative transportation” is defined as a waterborne conveyance that provides a reasonable means of transportation between the mainland and Fire Island. *Id.* § 7.20(a)(3). An alternative form of transportation exists when several criteria are met, including most notably, that the mode of transportation in question is “adequate to carry the person or object to be transported.” *Id.* § 7.20(a)(3)(iv).[4]

[4] The other three criteria are that: (1) the transportation schedule permits departure from a Fire Island terminal before 9:00 a.m. and departure from a mainland terminal after 5:00 p.m. on the same day; (2) the interval between the earliest and latest service provided by the transportation

This action concerns the permits governing "essential service vehicle(s)," which are known as Essential Service Permits. *Id.* § 7.20(a)(8)(ii)(D).[5] Pursuant to Section 7.20, the Superintendent may issue no more than 30 permits at any time to "public utility and essential service vehicles." *Id.* § 7.20(a)(8)(ii)(D). Essential services vehicles are defined as "any motor vehicle other than a public utility vehicle whose use on the Island is essential to the continued use of residences on the Island." *Id.* §§ 7.20(a)(1)(x).[6] Essential service vehicles include vehicles intended for "[s]anitation or refuse removal." *Id.* § 7.20(a)(1)(x)(B). The relevant regulations define "refuse" as "trash, garbage, rubbish, waste papers, bottles or cans, *debris*, litter, oil, solvents, liquid waste, or other discarded materials." *Id.* § 1.4 (emphasis added). Moreover, all permits "may contain such other limitations or conditions as the Superintendent deems necessary for resource protection, public safety, or visitor enjoyment." *Id.* § 7.20(a)(9)(v).[7]

---

service in question on any day exceeds eight hours, provided there is at least one round trip between the mainland and the island during that time; and (3) the transportation terminal is no more than one mile from the point of origin or destination on the island. 36 C.F.R. § 7.20(a)(3)(i)–(iii).

[5] The terms "Essential Service Permits" and "Special use Permits" are interchangeable, as certain documents in the administrative record and the Wetherall Plaintiffs' submissions use the latter term.

[6] A "public utility vehicle" is a motor vehicle "operated and owned or leased by a public utility or public service company franchised or licensed to supply, on the island, electricity, water, or telephone service, while that vehicle is in use for supplying such service." 6 C.F.R. § 7.20(a)(1)(vii).

[7] These limitations "may include, but will not be limited to, restrictions on locations where vehicle travel is authorized and times, dates, or frequency of travel, in accordance with the provisions of this paragraph." 36 C.F.R. § 7.20(a)(9)(v).[8] Prior permits included varying language to similar effect. As discussed *infra*, the Superintendent issued the Wetherall Plaintiffs' 2026 Essential Service Permits—the first permits to exclude such a clause—in the course of this litigation and after oral argument on the parties' cross-motions for summary judgment during which I asked counsel about similar language in Section 7.20. (Jan. 20, 2026 Hg'r Tr. ("Tr.") 22:22–27:18.)

Village Administrator Posillico attests that from 1969 through 2025—more than five decades—the Superintendent issued Waters and his predecessor annual Essential Service Permits to operate motor vehicles on Seashore lands. (First Posillico Decl. ¶ 35.) The Administrative Record contains copies of the one-year Essential Service Permits issued to Waters' predecessor for 2015, 2016, 2018, 2019, and 2020 and to Waters for the years 2021 through 2025. (AR. 445, 495, 534, 571, 603, 686, 688, 695, 697, 723; ECF No. 62.)

Following the close of briefing, the Wetherall Plaintiffs filed several 2026 Essential Service Permits recently issued to them by the Superintendent for the period from January 1, 2026 through December 31, 2026. (ECF No. 62.) No party has cited in their submissions any Essential Service Permits in the Administrative Record that were issued to Wetherall Carting before 2015. (*See* Defs.' Mem. at 21–22 (citing permits starting in 2020); Posillico Decl. ¶ 36 (erroneously stating that the Administrative Record contains the permits issued in years 2015 through 2019, 2024, and 2025).)

Each permit in the record is identified as either a "Special Use" or an "Essential Service" permit and authorizes "travel on" or "travel across Fire Island Seashore lands," although the specific terms have changed over time. (AR. 445, 495, 534, 571, 603, 686, 695, 723; ECF No. 62.) For example, the permits issued in 2015, 2016, and 2018 consist primarily of a summary of permitted activity and the dates and times during which travel was authorized. (AR. 697, 696, 688.) Starting in 2019, the Superintendent began including a two-page list of "terms and conditions" with the permits. (AR. 446–47, 496–97, 535–36, 572–73, 686–87, 723–26.) No two permits are identical. Over the years, the permits have changed in three ways that are material here. The changes concern: (1) the description of the permitted activity (i.e., what materials may be transported over land by the permit holder); (2) whether the permit includes what is referred

to as a "waterborne travel clause," i.e., a clause that limits travel on Seashore lands to those times "when alternative transportation" by water "is unavailable"; and (3) whether the permit includes a clause precluding certain materials from being carted over land. (*Id.*)

As demonstrated in the table below, between 2015 and present, the Superintendent has issued permits to the Wetherall Plaintiffs for the carting of "sanitation and refuse," "municipal solid waste," and workers and materials for "construction, maintenance." (AR. 445, 495, 534, 571, 603, 686, 695, 723.) However, none of the permits define the term "municipal solid waste." Until 2026, each Essential Service Permit included a waterborne travel clause either within the "summary of permitted activity" or in the terms and conditions appended to the permit. (*Id.*) For example, in the 2024 and 2025 Essential Service Permits, the Superintendent included the following statement at the end of each permit, which requires the use of waterborne transportation: "When water transportation is available, the permit holder shall accomplish all transportation of materials, supplies, and crews by the nearest available ferry, freight, or other overwater transportation method." (AR. 606, 726.)[8]

[8] Prior permits included varying language to similar effect. As discussed *infra*, the Superintendent issued the Wetherall Plaintiffs' 2026 Essential Service Permits—the first permits to exclude such a clause—in the course of this litigation and after oral argument on the parties' cross-motions for summary judgment during which I asked counsel about similar language in Section 7.20. (Jan. 20, 2026 Hg'r Tr. ("Tr.") 22:22–27:18.)

**Table: Essential Service Permits Issued to the Wetherall Plaintiffs**

| **Year** | **Permitted Activity** (on Seashore lands) | **Waterborne Travel Clause?** | **Express Limitations on Materials Carted?** |
|---|---|---|---|
| 2015 | Travel "for the purposes of transporting **sanitation and refuse removal**" (AR. 697) | Yes | Permit expressly provides that it "does not authorize transportation . . . for the delivery of building supplies, landscape materials, or plants" (AR. 697) |
| 2016 | Travel "for the sole purpose of transporting **municipal solid waste"** (AR. 695) | Yes | Permit expressly provides that it "does not authorize transportation . . . for the delivery of building supplies, landscape materials, or plans" and does not define "municipal solid waste" (AR. 695) |
| 2017 | Unknown | Unknown | Unknown – No party has identified the location of a 2017 permit in the Administrative Record, and the Court has found none. |
| 2018 | Travel "to transport workers, supplies, and materials . . . for work involved in construction, maintenance, or repair of structures" (AR. 688) | Yes | None (AR. 688) |
| 2019<br>2020<br>2021<br>2022<br>2023<br>2024<br>2025 | Travel "for the sole purpose of transporting **municipal solid waste**" (AR. 445, 495, 534, 571, 603, 686, 723) | Yes | No express limitations. However, the permit must be used for "purposes of residential access" and may not be used to "operate a construction or retail business." (*See, e.g.*, AR. 687.) The permits do not define "municipal solid waste." (AR. 446–47, 496–97, 535–36, 572–73, 687, 723–26) |
| 2026 | Travel "for the sole purpose of transporting **municipal solid waste**" (ECF No. 62) | No | No express limitations, and the permits do not define "municipal solid waste." (AR. 725–26) |

Because the Essential Service Permits issued to Wetherall Carting prior to 2015 are not in the Administrative Record, there is no record of what they authorized. Posillico attests that "upon

knowledge and belief," in 2019 and "many years prior," the Essential Service Permits issued to Wetherall specified that the purpose for authorized travel was "the all-encompassing category of 'refuse and sanitation.'" (Posillico Decl. ¶ 55.) However, only the 2015 Essential Service Permit authorizes travel "for the sole purposes of transporting sanitation and refuse removal," while the 2016, 2018, and 2019 permits do not. (AR. 697.) In an email dated May 13, 2014, a FINS staff member and Posillico discussed the times during the day when Wetherall was permitted to travel over the FINS pursuant to the 2014 Essential Service Permit. (AR. 13.) The staff member explained that the agency:

> recognize[d] the public health risk associated with household waste and removing those items from Fire Island would be a priority. *Containers with C&D debris* would still be confined to before 9:00 a.m. and 6:00 p.m. since they do not have the same health risk . . . they would still be able to transport these types of waste off of Fire Island *by barge*.

(*Id.*)[9] One month later, the former Superintendent sent Wetherall a letter approving driving privileges to transport "residential sanitation" three days per week and requiring that transportation of construction debris be completed prior to 9:00 a.m. on Monday through Friday. (AR. 16.)

## IV. Violation Notices and the Original Determinations

Despite varying language used in the Essential Service Permits issued to the Wetherall Plaintiffs, until 2024, the Village and its carter "consistently removed all construction debris and all other refuse and sanitation from the Village by vehicle over land across the FINS Roadway" without incident. (First Posillico Decl. ¶¶ 37, 56.) The Village has never "barged sanitation and refuse from the Village." (*Id.* ¶ 3(d).)

---

[9] Excerpts from documents in the record have been reproduced here exactly as they appear in the original. Errors in spelling, punctuation, and grammar have not been corrected or noted.

Posillico attests, on "knowledge and beli[ef]," that the Superintendent stated at a September 14, 2024 meeting of the governing board of the Fire Island Association, which was attended by 30 representatives of Fire Island communities, that construction debris could be carted as long as vehicles were properly covered. (*Id.* ¶ 66.)[10]

However, starting in September 2024, NPS began ticketing Wetherall Carting for transporting construction debris on the FINS Roadway on the basis that its 2024 Essential Service Permits for transporting "municipal solid waste" did not allow the transportation of construction debris. (AR. 735, 739, 741.) The National Park Service issued violation notices to Wetherall Carting on this basis on the following dates: September 13, 2024; September 20, 2024; and January 24, 2025. (*Id.*) Following the issuance of the violations, Waters contacted the FINS to explain that he had never had a problem transporting construction debris before. (AR. 112–14.) Posillico also contacted the FINS and, on October 16, 2024, Superintendent Romero informed Posillico by email that "law enforcement staff have consistently enforced this regulation when they have seen an essential services carter transporting construction debris improperly." (*Id.* 116.)

Thereafter, the Village met with the Superintendent and four other agency staff on November 1, 2024, and objected to the violations issued to the Wetherall Plaintiffs' drivers. (AR. 122, 131.) What appear to be notes from that meeting are in the Administrative Record. (*Id.* 122.) They reflect that the Village argued that the violation notices issued to Wetherall Carting "were inconsistent with past practices" and that the regulations did not "define the difference

[10] Rule 56(c)(4), Fed. R. Civ. P., requires that evidence used to support or oppose summary judgment "be made on personal knowledge." Thus, I do not consider Posillico's representation here when deciding whether or not to grant summary judgment to any party.

between municipal and construction debris," which caused a situation that "was untenable and posed a direct threat to essential services" for the Village. (*Id.*) In response, a FINS representative "emphasized that this [was] not a new initiative or regulation" and that the rule had "been in place since Superstorm Sandy [in 2012] if not before." (*Id.* 123.) A FINS staff person explained that law enforcement "do not randomly stop vehicles or target those suspected of carrying waste; they only stop trucks when the waste is not properly covered or when debris is visible . . . ." (*Id.*)

On December 20, 2024, Superintendent Romero sent a one-page letter (the December 20, 2024 Determination) to Village Mayor Hugh O'Brien on NPS/FINS letterhead "memorializ[ing]" the November 1, 2024 meeting. (AR. 131.) The letter indicates that NPS had issued three violation notices to the Wetherall Plaintiffs' drivers for "failure to comply with permit conditions." (*Id.*) In the agency's view, the Wetherall Plaintiffs' 2024 Essential Service Permits "specifically excluded construction debris" through the permit language authorizing travel "for the sole purpose of transporting municipal waste . . . ." (*Id.*) The Superintendent also made the factual finding that "construction waste can be removed by waterborne transportation" and stated that NPS would "continue the strict enforcement of waterborne transportation for the removal of construction debris." (*Id.*)

On January 7, 2025, Superintendent Romero sent Mayor O'Brien a second, nearly identical letter (the January 7, 2025 Determination) repeating the same findings, interpretations, and conclusions set forth in the December 20, 2024 Determination. (AR. 132.) Like the earlier letter, the January 7, 2025 Determination states that NPS had issued three violation notices to Wetherall Carting for "failure to comply with permit conditions." (*Id.*) It also sets forth the interpretation that text in the Wetherall Plaintiffs' 2024 Essential Service Permits stating that

travel over the FINS was authorized "for the sole purpose of transporting municipal waste . . . *specifically excluded construction debris*." (AR. 132 (emphasis added).) Finally, it also includes the factual finding that "construction waste can be removed by waterborne transportation" and reports that NPS will "continue the strict enforcement of waterborne transportation for the removal of construction debris." (*Id.*) This suit followed.

**V. Procedural History**

A. Litigation Commences

The Wetherall Plaintiffs commenced this action on January 31, 2025. (ECF No. 1.) On February 5, 2025, the Wetherall Plaintiffs sought a Temporary Restraining Order ("TRO"), and the Village moved to intervene. (ECF Nos. 6, 9.) At a February 6, 2025 hearing, I denied the Wetherall Plaintiffs' TRO motion, granted the Village's motion to intervene, and set a briefing schedule for the Village to file a complaint and for the parties to brief Plaintiffs' motion for a preliminary injunction. (Min. Entry, Feb. 7, 2025; Elec. Order, Feb. 7, 2025.) I also ordered the parties to participate in a settlement conference before the assigned magistrate judge. (Elec. Order, Feb. 7, 2025.)

B. The 2025 Essential Service Permits

When the Wetherall Plaintiffs initiated this action on January 31, 2025, their 2024 Essential Service Permits were set to expire by the end of the day. (AR. 603, 631.) On February 7, 2025, the Superintendent issued the 2025 Essential Service Permits to the Wetherall Plaintiffs, which were valid from January 1, 2025 through December 31, 2025. (*Id.* 646.) The 2025 Essential Service Permits authorized motor vehicle "travel across Fire Island National Seashore lands for the sole purposes of transporting municipal solid waste off of Fire Island," as did the 2024 Essential Service Permits. (*Compare* AR. 646 *with* AR. 631.) However, the Superintendent

made no indication on the face of the 2025 Essential Service Permits or through any other communication with Plaintiffs or the Court that the term "municipal solid waste" as used in the 2025 Essential Service Permits was to be interpreted any differently than the same text in the 2024 Essential Service Permits as set forth in the Original Determinations.

C. Continued Litigation and Mediation

On February 21, 2025, the Village filed their Intervenor Complaint (ECF No. 21), and the Wetherall Plaintiffs filed the Amended Complaint (ECF No. 25).

On March 11, 2025, the parties informed the assigned magistrate judge that through mediation, they reached "an interim resolution for the handling of construction debris through June 25, 2025." (Min. Entry, Mar. 11, 2025.) However, the parties' subsequent report regarding this interim resolution did not indicate that the Superintendent altered any interpretation of the terms used in the Wetherall Plaintiffs' 2025 Essential Service Permits or Section 7.20. (*See* ECF No. 34.)

At Plaintiffs' request, I adjourned the briefing schedule on Plaintiffs' motions for a preliminary injunction. (Elec. Order, Mar. 12, 2025; Elec. Order, Mar. 13, 2025.)

On March 17, 2025, the Village filed the Amended Intervenor Complaint and a letter reporting that the parties had agreed upon a briefing schedule for cross-motions for summary judgment. (ECF Nos. 34, 35.) The parties' proposed briefing schedule was entered on April 1, 2025. (Elec. Order, Apr. 1, 2025).

Defendants filed the Administrative Record on May 19, 2025. (ECF No. 42.) On June 18, 2025, the day before Plaintiffs' deadline to file their motions for summary judgment, Defendants filed, with Plaintiffs' consent, an untimely motion for an extension of the briefing schedule to allow the parties to pursue settlement negotiations in light of the approaching end of the interim

agreement. (ECF No. 43.) I granted Defendants' request. (Elec. Order, Jun. 20, 2025.) However, the parties did not resolve the dispute. Thereafter, on June 19, 2025 and July 3, 2025, the Village and the Wetherall Plaintiffs filed their respective motions for summary judgment, with supporting exhibits, including Posillico's Declaration. (ECF Nos. 44, 45, 46).

D. The July 23, 2025 Letter (the Subsequent Determination)

On July 23, 2025, more than five months after issuance of the 2025 Essential Service Permits, around one month after Plaintiffs filed their motions for summary judgment, and less than two weeks before Defendants' August 4, 2025 deadline to file their cross-motion for summary judgment, Superintendent Romero sent Mayor O'Brien and Waters a one-page letter on NPS/FINS letterhead. It stated the following:

> [I]t has been determined that, *going forward*, the current relevant terms and provisions of 36 C.F.R. § 7.20 shall be interpreted to allow holders of Essential Service Permits (the "Permits") containing language that authorizes carters to travel across Fire Island National Seashore Lands '*for the sole purpose of transporting municipal solid waste off Fire Island' to cart municipal solid waste, sanitation or refuse—including construction debris*. Please also be advised that this determination *does not alter any other term(s), condition(s) or limitation(s) set forth in the Permits, 36 C.F.R. § 7.20* or any other applicable law.

(Subsequent Determination, ECF No. 51-3 (emphasis added).) The Subsequent Determination also withdrew "any violation notice[s] issued to [Waters], his business or employees, for carting construction debris . . . ." (*Id.*) However, it did not revoke or otherwise address the finding in the Original Determinations that "construction waste can be removed by waterborne transportation." (*Compare id. with* AR. 131–32.) It also did not withdraw or revoke either the December 20, 2024 Determination or the January 5, 2025 Determination or any corresponding interpretations of terms used in the 2024 Essential Service Permits issued to the Wetherall Plaintiffs.

On July 28, 2025, Defendants filed a letter on the docket of this action reporting the issuance of the Subsequent Determination and requesting that Plaintiffs' motions for summary

judgment be held in abeyance. (ECF No. 48.) According to Defendants, the Subsequent Determination mooted Plaintiffs' claims. (*Id*. at 3.) Defendants requested either a return to mediation or a conference before the assigned magistrate judge and represented that they were willing to enter into a stipulation outlining the terms set forth in the Subsequent Determination, which would be subject to this Court's jurisdiction for enforcement purposes. (*Id.*) Defendants' letter did not, however, set forth Plaintiffs' position on the import of the Subsequent Determination or indicate whether Plaintiffs agreed to further mediation or settlement discussions. (*See id.*) Although it was not clear that the case was moot, I granted a two-week extension for the parties to determine whether they could reach a stipulation that would resolve the action. (Elec. Order, Jul. 30, 2025.)

On August 4, 2025, the Village sent a proposed Stipulation of Settlement to all parties, which Defendants rejected by email. (ECF No. 54.) Afterwards, Plaintiffs met and conferred with Defendants but the "conversation did not advance the prospect for a stipulated settlement." (*Id.* at 2.)

E. Motion Practice Continues

On August 18, 2025, Defendants filed their combined cross-motion for summary judgment and opposition to Plaintiffs' motion for summary judgment. (ECF No. 51.) On September 2, 2025, Plaintiffs filed their combined reply to Defendants' opposition to their motions for summary judgment and opposition to Defendants' cross-motion along with a second declaration by Posillico. (ECF Nos. 52, 53; Sept. 1, 2025 Decl. of Mario Posillico ("Second Posillico Decl.," ECF No. 52-1.) Later, it came to my attention that the briefing schedule proposed by the parties for their cross-motions for summary judgment did not include a reply by

Defendants on their cross-motion for summary judgment. I permitted Defendants to reply, which they did on January 14, 2026. (ECF No. 55; Elec. Order, Dec. 30, 2025.)

On January 20, 2026, the parties appeared for oral argument on their cross-motions for summary judgment. (Min. Entry, Jan. 22, 2026.) I asked the parties whether the Wetherall Plaintiffs were issued 2026 Essential Service Permits given the expiration of their 2025 Permits. I ordered the parties to file supplemental submissions on several issues addressed during the argument and instructed them to include any 2026 Essential Service Permits issued to the Wetherall Plaintiffs following the government's processing of Waters' permit application. (*Id.*)

The parties timely filed their supplemental submissions on February 27, 2026, but did not address whether the Wetherall Plaintiffs had been issued 2026 Essential Service Permits as of that date. (ECF Nos. 58–60.) On March 22, 2026, I ordered the parties to address whether any 2026 permits had been issued to the Wetherall Plaintiffs, and if so, to file them. (Elec. Order, Mar. 22, 2026.) On March 23, 2026, Waters filed on the public docket a copy of the Wetherall Plaintiffs' 2026 Essential Service Permits, which were issued on March 18, 2026. (ECF No. 61.) Like the 2024 and 2025 Essential Service Permits, they authorize the Wetherall Plaintiffs to "travel across Fire Island National Seashore lands for the sole purposes of transporting municipal solid waste off of Fire Island." (*Id.* at 592, 603, 631, 646.) The 2026 Essential Service Permits are effective from January 1, 2026 through December 31, 2026. (ECF No. 61.)

**STANDARD OF REVIEW**

"When a plaintiff seeks to hold unlawful and set aside agency action under the APA, the district court essentially sits as an appellate tribunal, reviewing the administrative record compiled by that agency when it made the decision and determining whether, for example, the agency's action was arbitrary, capricious, an abuse of discretion, otherwise not in accordance

with the law, or contrary to constitutional right, power, privilege, or immunity." *Saleh v. Blinken*, No. 22-1168, 2023 WL 5091819, at *1 (2d Cir. Aug. 9, 2023) (summary order); *see also Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). "The entire case on review is a question of law." *Chan v. U.S. Dep't of Transp*, 782 F. Supp. 3d 39, 62 (S.D.N.Y. 2025) (quoting *Am. Bioscience*, 269 F.3d at 1083). Accordingly, "a district court's procedural decision to award summary judgment is generally appropriate." *Aleutian Cap. Partners, LLC v. Scalia*, 975 F.3d 220, 229 (2d Cir. 2020).

However, "in cases involving review of a final agency action under the APA, the usual Rule 56 summary judgment standard does not apply." *Kapoor v. United States Citizenship & Immigr. Servs.*, 763 F. Supp. 3d 247, 254 (E.D.N.Y. 2025); *see also New York v. United States Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d 475, 516 (S.D.N.Y. 2019) (same). This is because "the Court's role is not to decide whether there is a genuine dispute of material fact," but to decide as a matter of law whether "an agency action is supported by the administrative record and consistent with the APA standard of review." *Kapoor*, 763 F. Supp. 3d at 254. In doing so, "Section 706 of the APA authorizes courts to review de novo 'all relevant questions of law' and 'interpret[ations] [of] constitutional and statutory provisions' made by an agency." *Aleutian*, 975 F.3d at 229 (quoting 5 U.S.C. § 706).

Nonetheless, the court's "review of agency actions under the Administrative Procedure Act is narrow and deferential." *Safe Haven Home Care, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 130 F.4th 305, 315 (2d Cir. 2025). Except under "limited circumstances," a court reviewing an agency decision is "confined to the administrative record compiled by that agency when it made the decision." *Id.* at 324. However, the Second Circuit has recognized that a court may review extra-record evidence in the following limited circumstances: (1) "when there has

been a strong showing in support of a claim of bad faith or improper behavior on the part of agency decisionmakers"; (2) "where the absence of formal administrative findings makes such investigation necessary in order to determine the reasons for the agency's choice"; and (3) where "the district court needs to supplement the record with background information in order to determine whether the agency considered all of the relevant factors." *Id.* at 324.

**DISCUSSION**

The Village moves for summary judgment on all claims and seeks relief in the form of: (1) an order nullifying and voiding the Original Determinations and "any associated restrictions in the 2025 Essential Service Permits prohibiting the removal of construction debris"; (2) a declaratory judgment "confirming the Village's and Wetherall Catering's right to continue removing construction debris . . . by vehicle"; and (3) an injunction enjoining Defendants from "preventing the Village and its carter from same, with the carter having the same rights and privileges that are applied to all other holders of essential service permits for the removal of sanitation and refuse." (Village's Mem. at 2.) The Wetherall Plaintiffs move for summary judgment only on their APA claims and seek the same relief as the Village. (Wetherall Mem. at 2, 7–8.)[11]

Defendants oppose Plaintiffs' motions and cross-move for summary judgment on all claims brought by the Village and on the Wetherall Plaintiffs' APA and tortious interference

[11] The Wetherall Plaintiffs do not move for summary judgment on their claim under the Equal Protection Clause of the Fifth Amendment to the U.S. Constitution or their request for a writ of mandamus. (Wetherall Am. Compl. ¶¶ 53–63.)

claims. (Defs.' Mem. at 11, 28, 32, 33.)[12] Defendants further argue that this Court lacks subject matter jurisdiction because all claims in this action are moot. (*Id*. at 8.)

## I. Mootness

Defendants argue that the Court lacks subject matter jurisdiction because the Subsequent Determination mooted all claims in this action. According to Defendants, the Subsequent Determination advises that "[g]oing forward" the term "municipal solid waste" in an Essential Service Permit authorizing carters to travel across Seashore Lands "for the sole purpose of transporting municipal solid waste off Fire Island" includes construction debris, and that Plaintiffs have therefore been afforded the relief they seek—permission "to drive across FINS to cart both residential waste *and* construction debris . . . ." (Defs.' Mem. at 3–4 (emphasis in original).)

Plaintiffs make three arguments in opposition. First, they contend that Defendants have not met their "heavy" burden under the voluntary cessation doctrine. (Village's Reply at 5; Wetherall Reply at 3–4.) Second, Plaintiffs maintain that the Subsequent Determination does not disturb the finding set forth in the Original Determinations that the Village's "construction waste can be removed by waterborne transportation" or the proclamation that "NPS will continue the strict enforcement of waterborne transportation for the removal of construction debris." (*Id.*) Third, Plaintiffs contend that the Subsequent Determination does not moot the Village's APA

---

[12] Although Defendants argue that the Wetherall Plaintiffs' Amended Complaint should be dismissed, Defendants failed to move for summary judgment on their Equal Protection claims or request for a writ of mandamus. (Defs.' Mem. at 35.)

claims that the Original Determinations were issued through an exercise of power that exceeded the powers delegated to the Superintendent. (*Id.*)[13]

A. Applicable Law

"The voluntary cessation doctrine traces to the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior." *Neurological Surgery Prac. of Long Island, PLLC v. United States Dep't of Health & Hum. Servs.*, 145 F.4th 212, 224 (2d Cir. 2025). In order to show that the voluntary cessation of allegedly illegal conduct has rendered a claim moot, a defendant must "demonstrate that (1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Id.*

With respect to the first prong of the voluntary cessation standard, "it is the defendant's burden to establish that it cannot reasonably be expected to resume *its* challenged conduct . . . whether the challenged conduct might recur immediately or later at some more propitious moment." *Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 243 (2024) (emphasis in original). "This is both a stringent . . . and a formidable burden," which requires "showing that it

[13] On reply, Defendants also argue that Plaintiffs' claims are moot because (1) the Wetherall Plaintiffs' 2025 Essential Service Permits have expired and NPS had "yet to issue any permits to Saltaire, Waters, or any other carter for 2026"; and (2) the concession agreement between the Wetherall Plaintiffs and the Village had also expired. (Defs.' Reply at 3.) On March 18, 2026, NPS issued the Wetherall Plaintiffs Essential Service Permits in effect from January 1, 2026 through December 31, 2026, which like the 2024 and 2025 Essential Services Permits, authorize them to travel across Seashore lands for "the sole purposes of transporting municipal solid waste." (ECF No. 61.) Thus, Plaintiffs' requested relief in the form of an order voiding the Original Determinations and the corresponding interpretation of specific text in the 2025 Essential Service Permits applies equally to the 2026 Essential Service Permits, which have the same text. (*See* Village's Mem. at 2.) Plaintiffs have also filed a renewed concession agreement between the Village and Waters. (ECF No. 62.) Therefore, Defendants' motion for summary judgment is denied with respect to these mootness arguments.

is *absolutely clear* the alleged wrongful behavior could not reasonably be expected to recur." *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 603 (2d Cir. 2016) (emphasis in original). However, the plaintiff may rebut a showing of voluntary cessation by "point[ing] to" evidence "beyond the speculative" belief that a violation will reoccur. *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 88–89 (2d Cir. 2005); *see also Srour v. New York City, New York*, 117 F.4th 72, 83–4 (2d Cir. 2024) (same).

Despite this stringent standard, "[a] policy change from the government and a representation that, under the current circumstances, the government will not resume the challenged conduct, strongly support that the behavior is not reasonably expected to recur" because representations by the government that challenged conduct will not resume are "entitled to some deference." *Srour*, 117 F.4th at 83. However, "some deference does not equal unquestioned acceptance." *Mhany Mgmt.*, 819 F.3d at 604. Courts have therefore generally afforded the government deference where there is some indicia of reliability or assurance associated with the government's representations. Most often deference is warranted when the government "adopt[s] a formal policy, regulation, or law which, by its adoption, redressed the alleged harm." *Saba v. Cuomo*, 535 F. Supp. 3d 282, 296 (S.D.N.Y. 2021). After all, where the government "completely revise[s] its regulations *through proper procedures*," there is "no reason to think that . . . [the government] has any intention of returning to the prior regulatory scheme." *Granite State Outdoor Advert., Inc. v. Town of Orange, Conn.*, 303 F.3d 450, 451–52 (2d Cir. 2002) (emphasis added); *see also Lamar Advert. of Penn., LLC v. Town of Orchard Park*, 356 F.3d 365, 377 (2d Cir. 2004) (crediting a town's representation that an amendment to a town ordinance would not be changed based on the "deference due [to] the *legislative body*" (emphasis added)). Thus, in *Srour*, the government's change of position was entitled to some

deference because its representations were based on "new implementing regulations" formally promulgated by the city's police department. 117 F.4th at 83.

By contrast, where a defendant has not "pointed to any safeguards that would prevent [a] new policy from being changed, rescinded, or honored," the "manner of the . . . voluntary cession counsels *against* finding plaintiffs' claims moot." *Am. Council of the Blind v. City of New York*, 495 F. Supp. 3d 211, 248 (S.D.N.Y. 2020) (emphasis added). Thus, a district court held that the voluntary cessation doctrine was not satisfied where the city issued a new policy through a two-page "Memorandum" because the document could simply be revised "through a superseding memorandum." *Id*. at 248–49; *see also Saba*, 535 F. Supp. 3d at 297–98 (holding that a "Policy Statement" that the state "made a nonbinary 'X' gender designation available" "provides no assurance that a subsequent administration, or even this one . . . would not immediately reverse course . . . [because] there is nothing formal in place that would make a recurrence of the alleged constitutional violation unlikely").

However, the government is not always required to promulgate a formal regulation or policy to satisfy its heavy burden under the first prong of the voluntary cession doctrine. In *Lillbask*, for example, the plaintiff challenged an Individual Education Plan ("IEP"), which proposed transferring her from public school to a private special education facility. 397 F.3d at 84. After the district court lifted a preliminary injunction enjoining the plaintiff's transfer, defendants represented that they would not in "some future IEP, again attempt to place" the plaintiff at a special education facility. *Id.* at 88. Given this representation, the Second Circuit held that there was no reasonable expectation of recurrence based only on the possibility that the government could move the plaintiff in a "new IEP [that] must be prepared annually . . . ." *Id.* However, the court's reasoning hinged on the fact that there was "no reason to doubt the

sincerity of the defendants' representation" because they had "candidly acknowledged that [the plaintiff] '[had] flourished educationally'" while the preliminary injunction was in place, and teachers had "committed themselves to helping the child achieve such progress." *Id.* at 88–89.

On the second prong of the voluntary cessation standard—which requires determining whether interim relief or events have completely and irrevocably eradicated the effects of the alleged violation—a defendant has not carried its "heavy burden" where the plaintiff suffers "ongoing harm [ ] or lingering effect[s]" from the challenged conduct. *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 815 F.3d 105, 110 (2d Cir. 2016). These lingering effects need not themselves "constitute a violation of law." *Norman–Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1275 (9th Cir. 1998) (holding that claims were not moot where, even though the defendant ceased testing employees' blood and urine without their consent, defendants' retention of the test results constituted an ongoing effect of the challenged conduct even if not itself "a violation of law" (cited approvingly by *Am. Freedom Def. Initiative*, 815 F.3d at 110).) Thus, in *Saba*, the district court held that the New York Department of Motor Vehicles' provision of a driver's license with an "X" to the plaintiff did not irrevocably eradicate the effects of a gender marker policy that allowed only binary gender markers on New York state driver's licenses. *Saba*, 535 F. Supp. 3d at 299. The court reasoned that the "ensuing confusion caused by the DMV's continued practice of designating a binary gender for Plaintiff in its online records" constituted a lingering effect because of the risk that third parties would access those records. *Id.* By contrast, the Second Circuit has held that interim relief "irrevocably eradicated the effects of the alleged violation" where a plaintiff was no longer "subject to the [challenged] [r]egulation[]" and the State had promulgated a rule to "provide individuals like [plaintiff] with protection from the harm [plaintiff] fears." *Doe v. McDonald*, 128 F.4th 379, 385–86 (2d Cir. 2025); *cf.*

*Wimberly v. Experian Info. Sols., Inc.*, No. 18-cv-6058, 2019 WL 6895751, at *10 (S.D.N.Y. Dec. 18, 2019) (holding that the second prong of the voluntary cessation doctrine was satisfied where it was "clear" that defendants' conduct "fully remedies Plaintiffs' harm").

B. Analysis

Here, Plaintiffs' claims are not moot because Defendants have failed to meet their heavy burden with respect to both prongs of the voluntary cessation doctrine. Defendants fail to show that the challenged factual findings and interpretations of 36 C.F.R. § 7.20 and corresponding text in the 2024 Essential Service Permits as set forth in the Original Determinations have been voided or that there is no reasonable expectation that they will recur. Defendants also fail to demonstrate that the Subsequent Determination completely and irrevocably eradicated these factual findings and interpretations. Accordingly, no claims are dismissed as moot under the voluntary cessation doctrine.

***i. Reasonable Expectation of Recurrence***

Defendants argue that there is no reasonable expectation that Waters will be ticketed again for transporting construction debris over the FINS Roadway because Defendants' counsel made "a representation" at the January 20, 2026 oral argument before this Court that the "items of [the Subsequent Determination] will be followed." (Tr. 19:9–13.) However, Defendants have failed to meet their "formidable burden" under the voluntary cession doctrine for the following reasons. *Mhany Mgmt.*, 819 F.3d at 603.

It is helpful to first consider what the Subsequent Determination actually does and does not do. At most, the Subsequent Determination changes the Superintendent's interpretation, *going forward*, of the term "municipal solid waste" as used in (1) Essential Service Permits in effect on July 23, 2025 (the date the Subsequent Determination was issued), which includes the

Wetherall Plaintiffs' 2025 Essential Service Permits, and (2) any future Essential Service Permits, such as the Wetherall Plaintiffs' 2026 Essential Service Permits, which are the current operative permits. (Subsequent Determination, ECF No. 51-3.) This is apparent from the plain text of the Subsequent Determination:

> [I]t has been determined that, ***going forward,*** the current relevant terms and provisions of 36 C.F.R. § 7.20 shall be interpreted to allow holders of Essential Service Permits (the "Permits") containing language that authorizes carters to travel across Fire Island National Seashore Lands 'for the sole purpose of transporting municipal solid waste off Fire Island' to cart municipal solid waste, sanitation or refuse—including construction debris.

(Subsequent Determination) (emphasis added).

Although the Subsequent Determination states that it is reinterpreting "the current relevant terms and provisions of [Section 7.20]," it does not identify any specific "relevant terms and provisions" of the regulation that are being interpreted. (*Id.*) Section 7.20 itself does *not* use the term "municipal solid waste," which is the operative term in the Wetherall Plaintiffs' 2025 Essential Service Permits. (*Id.*; AR. 131–32.) Rather, Section 7.20 provides the Secretary with authority to regulate the operation of motor vehicles on Fire Island through the issuance of permits, including permits for vehicles providing "services essential to . . . the occupancy of residences on" Seashore lands. 36 C.F.R. § 7.20(a)(4), (5)(iii), (6). Section 7.20(a)(1)(x) defines the term "essential service vehicles" to include vehicles used for "[s]anitation or refuse removal." 36 C.F.R. § 7.20(a)(1)(x). Thus, under a generous reading, the Subsequent Determination is an obscure, confusing, and indirect attempt by the Superintendent to interpret Section 7.20(a)(1)(x)'s reference to vehicles used for "[s]anitation or refuse removal" to include vehicles transporting construction debris such that construction debris may be permissibly transported by truck over the FINS pursuant to Section 7.20, the 2025 Essential Service Permits *going forward*,

and any future Essential Service Permits, such as the Wetherall Plaintiffs' 2026 Essential Service Permits.

To be clear, from February 7, 2025 (the date on which the Wetherall Plaintiffs' 2025 Essential Service Permits were issued) through July 22, 2025, the Original Determinations controlled the interpretation of the term "municipal solid waste" as used in the Wetherall Plaintiffs' 2025 Essential Service Permits, notwithstanding the parties' entry into an "interim resolution" through June 25, 2025. However, the Superintendent altered that interpretation by issuing the Subsequent Determination on July 23, 2025, such that the term "municipal solid waste" as used in all current and future Essential Services Permits, which includes the Wetherall Plaintiffs' 2025 Essential Service Permits, was understood to include construction debris *going forward*.

However, there are a number of things that the Subsequent Determination did *not* do, which are understandably of concern to the Village and the Wetherall Plaintiffs. The Superintendent has not withdrawn the Original Determinations or voided any language in them. Moreover, the Subsequent Determination expressly provides that it "does not alter any other term(s), condition(s) or limitation(s) set forth in the permits, 36 C.F.R. § 7.20 or any other applicable law." (Subsequent Determination.) Plaintiffs are correct that the Subsequent Determination does not alter the factual finding in the Original Determinations that "construction waste [from the Village] can be removed by waterborne transportation." (AR. 131–32.) Nor does it discontinue the policy that "NPS will continue the strict enforcement of waterborne transportation for the removal of construction debris." (Village's Reply at 5 (quoting AR. 132).) With this understanding, there are four overarching reasons why the Subsequent Determination does not show that the challenged factual findings and interpretations of Section 7.20 and

corresponding text in the 2024 Essential Service Permits set forth in the Original Determinations are not reasonably expected to recur.

First, because the Subsequent Determination is not a "formal policy, regulation, or law," there is "nothing formal in place that would make a recurrence" of the challenged conduct unlikely. *Saba*, 535 F. Supp. 3d at 297. The Superintendent is not a "legislative body." *Lamar*, 536 F.3d at 377. The Subsequent Determination is not a formally promulgated regulation. Nor was it required to be for the reasons explained below. *See* Discussion § II.D. It was not issued subsequent to an amendment, recission, or promulgation of a new regulation as was the government's change of position in *Srour*, 117 F.4th at 83–4. Accordingly, the representation of Defendants' counsel during oral argument that the Subsequent Determination "will be followed" does not carry the assurance that Superintendent Romero and future Superintendents will not "reverse or revise" the Subsequent Determination once this litigation has ended. *Am. Council of the Blind*, 495 F. Supp. 3d at 249. To the contrary, Defendants have repeatedly altered the terms of the Wetherall Plaintiffs' Essential Service Permits, including with respect to the scope of the "permitted activity" described at the top of each permit. *See* Background § III. The Subsequent Determination is therefore analogous to the two-page memorandum in *American Council of the Blind*, 495 F. Supp. 3d at 248, and the policy statement in *Saba*, 535 F. Supp. 3d at 297, both of which were insufficient to moot plaintiffs' claims.

Defendants nonetheless maintain that because Plaintiffs "challenged a determination written in a letter," a superseding letter is enough to moot their claims. (Tr. 20:11–20.) Although they cite no authority for this proposition, Defendants appear to argue that because both of the Original Determinations appear in one-page letters, the government revised its position "through proper procedures" by issuing another one-page letter in the form of the Subsequent

Determination. *Granite State*, 303 F.3d at 451–52. However, Plaintiffs' APA claims against arbitrary and capricious agency action rest on the premise that the Original Determinations were *not* issued pursuant to proper procedures because they were not the product of reasoned decisionmaking that involved consideration of Plaintiffs' reliance interests and the Village dock's lack of capability to allow construction debris to be removed by barge. *See infra* Discussion § II.B. Defendants have not shown that the Subsequent Determination was issued following a different procedure, one in which the Superintendent actually considered Plaintiffs' reliance interests and the capabilities and deficiencies of the Village dock and related infrastructure, such as the Village walks. Nor have they shown that, between issuance of the Original Determinations (on December 20, 2024 and January 7, 2025) and the Subsequent Determination (on July 23, 2025), the Superintendent used any particular process or engaged in a reasoned consideration of any particular facts when revising his interpretation of the term "municipal solid waste" in the 2025 Essential Service Permits to include "construction debris" or his interpretation of the reference to vehicles used for "[s]anitation or refuse removal" in 36 C.F.R. § 7.20(a)(1)(x) to include vehicles involved in removing construction debris.[14]

Rather, the record indicates that Defendants changed their position as set forth in the Subsequent Determination simply because they were "on the eve of summary judgment," with less than two weeks before their deadline to file a cross-motion for summary judgment. *Mhany Mgmt.*, 819 F.3d at 604; *see id*. (holding that when "suspicious timing and circumstances" pervade a defendant's change of policy courts should "view[] mootness claims skeptically"). It is of note that Defendants did not change their position when they issued the Wetherall Plaintniffs'

[14] As noted, the Subsequent Determination does not even explicitly or clearly state that it is revising the term "[s]anitation or refuse removal" in 36 C.F.R. § 7.20(a)(1)(x).

2025 Essential Service Permits on February 7, 2025, or at any time before the expiration of the parties' interim resolution for the removal of the Village's construction debris on June 25, 2025. (*See* Min. Entry, Mar. 11, 2025; ECF No. 34.) The timing of Defendants' sudden change in position distinguishes this case from *Lillbask*, where the defendants' representations were supported by counsel's acknowledgment that the plaintiff had flourished in her current school—obviating any reason for the government to reverse its position after litigation ended. 397 F.3d at 88. Additionally, because the Subsequent Determination did not void or withdraw the Original Determinations, the Village's claims that the Original Determinations were issued in excess of the Superintendent's delegated authority and in violation of the APA's notice and comment procedures and NEPA's procedural requirements remain ripe for resolution.

Second, the Wetherall Plaintiffs remain vulnerable to being ticketed for transportation of construction debris over the FINS Roadway notwithstanding the issuance of the Subsequent Determination. As addressed above, the Subsequent Determination does nothing to change the factual findings in the Original Determinations that "construction waste [from the Village] can be removed by waterborne transportation." (AR. 132.) Nor does it alter the policy that "NPS will continue the strict enforcement of waterborne transportation for the removal of construction debris." (Village's Reply at 5 (quoting AR. 132).) These facts are significant because, up until 2026, every permit in the record that the Superintendent issued to the Wetherall Plaintiffs included a clause analogous to the provision in the 2025 Essential Service Permit, which provides that "[w]hen water transportation is available, the permit holder shall accomplish all transportation . . . by use of the nearest available ferry, freight, or other overwater transportation method." (AR. 726; *see also supra* Background § III.) Thus, the Wetherall Plaintiffs remain at risk of being ticketed for carting construction debris over the FINS Roadway.

At oral argument, I questioned Defendants' counsel about whether Defendants were "going to revisit the sentence[s]" in the Original Determinations concerning the feasibility of waterborne disposal of construction debris and NPS's strict enforcement of waterborne transportation. (Tr. 58:9–21.) Defendants' counsel avoided answering this question, asserted that Plaintiffs are "able to [barge construction debris] from their community," and stated Defendants' position that "we can regulate what happens on our property" and the "effect of that is that [Plaintiffs] might have to find another way" to dispose of construction debris. (Tr. 58:17–59:22.) After the hearing, the Superintendent issued the 2026 Essential Service Permits to the Wetherall Plaintiffs, which do not include the express requirement that the authorized transportation be accomplished over water when available. (ECF No. 61.) However, Section 7.20(a)(10)(i) continues to provide that, notwithstanding the issuance of an Essential Service Permit, "travel across Seashore lands by motor vehicles with valid permits will be authorized *only on those days in which the island location . . . is not served by alternative transportation*," including waterborne transportation. 36 C.F.R. § 7.20(a)(10)(i) (emphasis added). In light of statements made by Defendants' counsel on the record, there is a reasonable probability that even under the Subsequent Determination, Defendants may resume ticketing the Wetherall Plaintiffs for carting construction debris over the FINS Roadway once Defendants are no longer facing a summary judgment motion or otherwise involved in this litigation.

Defendants argue that the Wetherall Plaintiffs have never been cited with a violation of Section 7.20(a)(10)(i) and that Plaintiffs' concern that Waters will be ticketed under this provision is not "subject to this litigation." (Tr. 27:10–21.) It is true that the violations issued to the Wetherall Plaintiffs' drivers only concern carting construction debris contrary to the permit language authorizing the transport of "municipal solid waste." (AR. 735, 739, 741.) However,

the Village argues that its vulnerability to ticketing under Section 7.20(a)(10)(i) is an issue in this litigation because Defendants mandated barging in the Original Determinations. (Tr. 33:1–23.) This raises an issue as to mootness and the scope of Plaintiffs' APA claims.

"A claim is moot where an amendment renders a challenged provision sufficiently altered as to present a substantially different controversy from the one that existed when the suit was filed." *Lamar*, 356 F.3d at 378. That is not the case here because if Defendants were to begin ticketing the Wetherall Plaintiffs for violating Section 7.20(a)(10)(i), the "gravamen" of Plaintiffs challenge to such ticketing would be the same as that which spurred the filing of this action—that the Original Determinations, which were not amended by the Subsequent Determination, contain arbitrary and capricious factual findings and interpretations because Defendants issued them without considering Plaintiffs' reliance interests and the Village's lack of capacity to transport construction debris by barge from its dock. *Am. Freedom Def. Initiative*, 815 F.3d at 109; *see also Lamar*, 356 F.3d at 378 ("A plaintiff's claims will not be found moot where . . . the law, after amendment, suffers from similar infirmities").

For the same reasons, Plaintiffs are correct that Defendants' potential ticketing of the Wetherall Plaintiffs for a Section 7.20(a)(10)(i) violation for carting construction debris over the FINS Roadway is within the subject of the litigation despite the fact that the Village's Amended Complaint does not explicitly address this regulation. The issue of whether Plaintiffs remain vulnerable to ticketing under Section 7.20(a)(10)(i) became relevant only *after* Defendants issued the Subsequent Determination less than two weeks before the deadline to oppose Plaintiffs' motion for summary judgment, in which Defendants argue mootness on the basis of the Subsequent Determination. On reply, the Village contends that the Subsequent Determination "did *not* disturb the portion of the [Original Determinations] in which Defendants had

maintained that 'construction waste [from the Village] can be removed by waterborne transportation' . . . [and] [t]his is extremely important because . . . [the permits] only provided authority 'to travel across [Seashore lands] . . . *when ferries and waterborne conveyances do not provide access*." (Second Posillico Decl. ¶¶ 6–7 (emphasis in original) (quoting AR. 132, 646, 652 (January 7, 2025 Determination and 2021 and 2022 Permits).) Only the 2026 Essential Service Permits, which were issued in March 2026, *after* the close of briefing on the cross-motions for summary judgment do not include this specific text. (ECF No. 62.) Thus, I must consider Section 7.20(a)(10)(i).

Third, Defendants' representations are not enough to establish that it is absolutely clear that there is no reasonable expectation that the challenged factual findings and interpretations of Section 7.20 and the term "municipal solid waste" as used in the 2024 Essential Service Permits will recur because Defendants' counsel failed to express "an unequivocal commitment that [Defendants] [do] not intend[] to reinstate" all findings and interpretations in the Original Determinations. *Ciaramella v. Zucker*, No. 18-cv-6945, 2019 WL 4805553, at *5 (S.D.N.Y. Sept. 30, 2019) (holding that statements that there was "no reasonable expectation that [Defendants] will resume the challenged conduct" were not sufficiently unequivocal). I am assured that Defendants will not re-issue the three violations that the Superintendent issued to the Wetherall Plaintiffs' drivers in 2024 and 2025. However, as discussed at length, Defendants did not withdraw the Original Determinations or revisit the waterborne transportation findings set forth in them. When asked how the Plaintiffs and the Court could be sure that Defendants would not change their position that the definition of "municipal solid waste" includes "construction debris" in the current and future Essential Service Permits, Defendants' counsel stated:

> In terms of the future, I can think of ifs, a hurricane hits and destroys, you know, FINS [R]oadway, that maybe changes the equation a little bit. You know, I can't speak for what

> the future holds, but as the status quo is being maintained, that letter is certainly the intent. And again[,] I'm making a representation . . . that the items of that letter will be followed.

(Tr. 19:3–11.) Counsel thus failed to express "an unequivocal commitment" that Defendants do not intend to ticket the Wetherall Plaintiffs' drivers for hauling construction debris over the FINS Roadway based on the findings in the Original Determinations that "construction waste [from the Village] can be removed by waterborne transportation." AR. 131–32; *see Ciaramella*, 2019 WL 4805553, at *5 (holding that statements that there was "no reasonable expectation that [Defendants] will resume the challenged conduct" were insufficiently unequivocal to render claims moot under the voluntary cessation doctrine).

Fourth, neither Defendants' offer to enter into a stipulation "so ordered by the court that tracks the language of [the Subsequent Determination]" nor Defendants' contention that the Court "can maintain and monitor the parties' situation in compliance" satisfies the voluntary cessation doctrine. (Tr. 21:2–8.) As discussed, Defendants fail to address the fact that the Subsequent Determination does not eliminate contested factual findings in the Original Determinations concerning the Village dock's capability to permit the removal of construction debris by barge—factual findings that Defendants have declined to revisit. Defendants' counsel did not indicate that a stipulation between the parties would be irrevocable, such that the Superintendent could not later decide to withdraw or otherwise terminate it. *Cf. Already, LLC v. Nike, Inc.*, 568 U.S. 85, 93 (2013) (finding case moot where the parties entered "unconditional and *irrevocable*" covenant that prevented allegedly unlawful activity from recurring (emphasis supplied)).

***ii. Complete and Irrevocable Eradication of the Effects of the Challenged Conduct***

Defendants argue that the Subsequent Determination "irrevocably eradicated the effects of" the Original Determinations by withdrawing all violations issued to the Wetherall Plaintiffs' drivers and permitting them to cart construction debris across Seashore lands going forward. *Neurological Surgery Prac.*, 145 F.4th at 223; *see* Subsequent Determination. In opposition, the Wetherall Plaintiffs argue that Waters was "prevented from performing [his] contract and suffered business disruption as a direct result of Defendants' actions," and that the Subsequent Determination does "nothing to remedy that harm or to provide assurance it will not recur." (Wetherall Reply at 4.) However, the Wetherall Plaintiffs do not cite any facts in the record showing that Waters sustained any losses from disruption to his business. (*See id.*) The Village does not specifically argue that the effects of the Original Determinations have not been completely and irrevocably eradicated. But it does argue that the Subsequent Determination: (1) "continue[s] to rely upon and hold the Village hostage to" the term "municipal solid waste"; and (2) does not disturb the factual findings in the Original Determinations that construction debris can be removed by waterborne transportation. (*Id.* at 5.)

The second prong of the voluntary cessation doctrine concerns whether Plaintiffs suffer any "lingering effect[s]" from Defendants' challenged conduct. *Am. Freedom Def. Initiative*, 815 F.3d at 110. Here, as already discussed at length, although the Subsequent Determination withdrew the specific violation notices that had been issued against the Wetherall Plaintiffs' drivers and altered Defendants' interpretation of the term "municipal solid waste" as used in the Wetherall Plaintiffs' 2025 Essential Service Permits going forward and in any future Essential Service Permits, it did not withdraw or amend the Superintendent's factual findings in the Original Determinations that "construction waste [from the Village] can be removed by

waterborne transportation." (Subsequent Determination; AR. 131–32.) Accordingly, the Subsequent Determination does not entirely "protect[] [Plaintiffs ]from the harm [they] fear[]." *Doe*, 128 F.4th at 386. Nor have Defendants fully remedied the harms given that the Original Determinations remain in place. *Wimberly*, 2019 WL 6895751, at *10.

Thus, the Original Determinations continue to have lingering effects on Plaintiffs just as the challenged conduct in *Saba* had lingering effects on the plaintiff in that action. 535 F. Supp. 3d at 299. There, the defendant DMV gave the plaintiff a driver's license with an "X" gender marking, but "continued [the] practice of designating a binary gender for Plaintiff in its online records." *Id*. Thus, the defendants' actions did not eradicate the "ensuing confusion" caused when third parties accessed the DMV's data containing a binary gender marking for the plaintiff. *Id*. at 299. Similarly, the Superintendent's undisturbed factual findings that the Village can remove construction debris by barge does not eliminate the continuing confusion regarding whether the Wetherall Plaintiffs may be ticketed for violating Section 7.20(a)(10)(i) by carting construction debris over the FINS Roadway.

Accordingly, Defendants have failed to meet their burden to show that any claims are mooted by their conduct following the commencement of this action, including but not limited to the issuance of the Subsequent Determination on July 23, 2025, less than two weeks before Defendants' summary judgment submissions were due. (Subsequent Determination.)

## II. APA Claims

The Village brings four separate APA claims: (1) a claim that the Superintendent exceeded his statutory authority in issuing the Original Determinations and "any associated restrictions" in Wetherall's 2025 Essential Service Permits (Village's Am. Compl. ¶ 153); (2) a claim that the Superintendent's issuance of the Original Determinations, which sets forth factual

findings that "construction waste can be removed by waterborne transportation," restrictions on the removal of "construction debris" over land, and corresponding interpretations of terms in 36 C.F.R. § 7.20 and the 2024 Essential Service Permits are "arbitrary and capricious" because the Superintendent failed to consider Plaintiffs' reliance interests or the capabilities of the Village dock (*id.* ¶ 159); (3) a claim that the Superintendent's interpretation of the term "municipal solid waste" in the Original Determinations and the Wetherall Plaintiffs' 2024 and 2025 Essential Service Permits were not in accordance with law because neither Section 7.20 nor the legislation granting the Superintendent delegated authority define the term "municipal solid waste" (Village's Mem. at 15–23; Wetherall Mem. at 5–6); and (4) a claim that the Original Determinations constitute "rules" that were unlawfully issued without notice and comment as required by the APA. (Village's Mem. at 23–25; Wetherall Mem. at 7.) The Wetherall Plaintiffs also challenge the Superintendent's issuance of the Original Determinations and interpretation of the term "municipal solid waste" in their 2024 and 2025 Essential Service Permits as arbitrary and capricious and not in accordance with the law. (Wetherall Am. Compl. ¶¶ 47–51.)

Plaintiffs move for summary judgment on all APA claims. Defendants cross-move, although they fail to respond to the Village's fourth APA claim, which contends that the Original Determinations constitute a "rule" that was unlawfully issued without notice and comment as required under the APA. (Village's Mem. at 15–24; Wetherall Mem. at 5–7; Defs.' Mem. at 20–33.)

For the reasons explained below, summary judgment is granted to Defendants on the first APA claim—that the Superintendent exceeded his statutory authority in issuing the Original Determinations and "any associated restrictions" in the Wetherall Plaintiffs' 2025 Essential Service Permits. The Superintendent carried out the challenged conduct through the exercise of

authority delegated to the Secretary of the Interior under the National Park Service and Related Programs, known as the Organic Act, Section, 54 U.S.C. § 100101, et. seq., and the FINS Act, 16 U.S.C. § 459e-6(a). Summary judgment is also denied to Plaintiffs on their claims that the Wetherall Plaintiffs' 2024 and 2025 Essential Service Permits were not issued in accordance with law and that the Superintendent issued the Original Determinations without notice and comment. Plaintiffs have not provided any authority supporting the claim that the permits were not issued in accordance with law, and they fail to show that the Determinations are legislative rules that could only be enacted after complying with the APA's notice and comment procedures.

However, Plaintiffs have met their summary judgment burden on their APA claims that Defendants engaged in arbitrary and capricious agency action because the Superintendent issued the Original Determinations and their corresponding factual findings, interpretations, and restrictions without considering Plaintiffs' reliance interests or the actual capability of the Village dock to barge construction debris.

A. Agency Action Taken Without Statutory Authority

The Village moves for summary judgment on its APA claim that the Superintendent exceeded his statutory authority in issuing the Original Determinations and "any associated restrictions" in the 2025 Essential Service Permits issued to the Wetherall Plaintiffs. It seeks an order declaring the Original Determinations "null and void as having been issued without congressional authorization and in excess of Defendants' limited delegated authority." (Village's Am. Compl. ¶ 156; Village's Mem. at 2, 10.) The Wetherall Plaintiffs move for summary judgment on similar grounds, although their Amended Complaint does not actually plead a claim under the APA that Superintendent Romero exceeded his statutory authority in issuing the

Original Determinations. (Wetherall Mem. at 4–5; Wetherall Am. Compl. ¶¶ 43–52.)[15] Defendants cross-move for summary judgment. (Defs.' Mem. at 11.) Before discussing the parties' positions and the relevant legal standards, I address the statutory and regulatory backdrop for Section 7.20.

#### *i. Statutory & Regulatory Background of Section 7.20*

The Property Clause of the U.S. Constitution grants Congress plenary power to make rules and regulations concerning the use of land belonging to the United States. U.S. Const., Art. IV, § 3, cl. 2; *California Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 580 (1987) ("[T]he power over the public land thus entrusted to Congress is without limitations."). Pursuant to that power, Congress established the NPS through the Organic Act of 1916, which Congress re-codified and consolidated with other existing laws in 2014 under Title 54 of the United States Code ("Title 54"). 54 U.S.C. § 100101 ("Section 100101"), et seq.; National Park Service and Related Programs Act, Pub. L. 113-287, 128 Stat 3094 (2013). The Organic Act provides that the Secretary of the Interior (the "Secretary"), acting through the Director of the NPS, shall:

> promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

---

[15] At most, the Wetherall Plaintiffs' Amended Complaint alleges that "Defendants' decision to limit what waste can be transported by the Plaintiffs did not adhere to proper rulemaking procedures and is not supported by the applicable regulations." (Am. Compl. ¶ 48.) These allegations relate to a claim that the Superintendent did not follow rulemaking procedures and acted contrary to existing regulations, not that he acted in excess of the authority delegated to him by Congress. Regardless, even if the Wetherall Plaintiffs' Amended Complaint had alleged a claim comparable to the Village's claim that Superintendent Romero engaged in conduct outside of his delegated authority, such a claim would be denied for the same reasons that I deny the Village's motion for summary judgment with respect to this claim.

54 U.S.C. § 100101. System units "include any area of land and water administered by the Secretary, acting through the Director, for park, monument, historic, parkway, recreational, or other purposes." 54 U.S.C. §§ 100102(6), 100501.

"[T]he Secretary, acting through the Director of the Park Service, has *broad authority* under the National Park Service Organic Act . . . to administer both lands and waters within all system units in the country." *Sturgeon v. Frost*, 587 U.S. 28, 38 (2019) (emphasis added) (citing 54 U.S.C §§ 100751, 100501, 100102). Section 100751(a) of Title 54 ("Section 100751(a)") provides that the Secretary "shall prescribe such regulations as the Secretary considers *necessary or proper* for the use and management of System units." 54 U.S.C. § 100751(a) (emphasis added); *see also* 54 U.S.C. § 320102(l) ("The Secretary shall perform any and all acts and make regulations not inconsistent with this chapter that may be necessary and proper to carry out this chapter.").

The FINS is an NPS System unit. *D'Arienzo*, 2024 WL 36983, at *1. In 1964, Congress enacted the FINS Act, which authorizes the Secretary to create the FINS "[f]or the purpose of conserving and preserving for the use of future generations certain relatively unspoiled and undeveloped beaches, dunes, and other natural features" in the area that is now the Seashore. 16 U.S.C. § 459e. That authority has been lawfully subdelegated to the FINS Superintendent. *United States v. Matherson*, 367 F. Supp. 779, 781 (E.D.N.Y. 1973), *aff'd*, 493 F.2d 1399 (2d Cir. 1974).

Several statutory provisions govern the Secretary's powers and obligations in carrying out the FINS Act. Most significantly, Section 459e-6(a) charges the Secretary with "administer[ing] and protect[ing] the [FINS] with the primary aim of conserving the natural resources located there." 16 U.S.C. § 459e-6(a). Section 459e-6(c) provides that in

"administering, protecting, and developing the entire" FINS, the Secretary "shall be guided by . . . the applicable provisions of the *laws related to the national park system*" and Sections 459e to 459e-9 of Title 16. 16 U.S.C. § 459e-6(a), (c) (emphasis added); *Morton v. Ruiz*, 415 U.S. 199, 231 (1974) ("The power of an administrative agency to *administer* a congressionally created and funded program necessarily requires the formulation of policy and the *making of rules* to fill any gap left, implicitly or explicitly, by Congress." (emphasis added)). The Secretary may also "utilize any other statutory authority available to him for the conservation and development of natural resources to the extent he finds that such authority will further the purposes of sections 459e to 459e-9." 16 U.S.C. § 459e-6(c). Most of the remaining provisions within Sections 459e to 459e-9 impose various duties on the Secretary, many of them accompanied by concomitant regulatory or other enforcement authority. This includes (1) the power to acquire property within the Seashore's boundaries, 16 U.S.C. § 459e-1(a), and "issue [zoning] regulations" for "carry[ing] out" such acquisition, *id.* § 459e-2(a); (2) to "permit hunting, fishing, and shellfishing" in the Seashore, except where the Secretary designates otherwise, *id.* § 459e-4; and (3) to administer and preserve various parks and lands within the Seashore, *see id.* §§ 459e-6(a)–(b) (Sunken Forest Preserve and Davis Park-Smith Point), 459e-12 (William Floyd Estate).

Pursuant to these various statutes, the NPS promulgated Section 7.20 in 1977 "under the authority" of provisions in the Organic Act that now correspond to Sections 100751, 100501, and 103102 and Section 459e-6 of the FINS Act. Fire Island National Seashore, New York Vehicle Use Regulations, 42 Fed. Reg. 35859 (proposed Jul. 12, 1977) (to be codified at 36 C.F.R. § 7.20) (citing 16 U.S.C. §§ 1c, 3, 17j-2(b), 459e-6); 42 Fed. Reg. 62483 (Dec. 13, 1977) (final

rule).[16] The face of the Essential Service Permits issued to the Wetherall Plaintiffs from 2018 through 2023 likewise identify their "authorizing legislation or other authority" as Section 100101, Section 459e, and Section 7.20(a). (AR. 445, 495, 534, 571, 685, 688.) The 2024 and 2025 Essential Service Permits issued to the Wetherall Plaintiffs identify the authorizing legislation and authority for the permits as Sections 100101, 100751(a), and 103104 and Sections 459e(b) and 459e-6(a). (AR. 603, 723.)

***ii. Analysis***

Despite the numerous citations to the Organic Act in both the promulgation of Section 7.20 and the relevant Essential Service Permits, the Village's motion mistakenly assumes that the FINS Act is the only possible basis of statutory authority for regulating motor vehicle travel on the FINS Roadway. (*See* Village's Mem. at 4–5.) On this basis, the Village argues that the Original Determinations and any associated restrictions within Wetherall's Essential Service Permits exceeded the "limited rulemaking power" delegated to the Superintendent by the FINS Act, without addressing the Organic Act. (*Id.*) The Village's arguments are also imprecise because, although the Village at times describes the Original Determinations and the "municipal solid waste" clauses in Wetherall's permits as the actions taken by the Superintendent that allegedly exceeded his rulemaking authority, elsewhere the Village appears to challenge the promulgation of Section 7.20, even if it does not seek any related relief, such as invalidation of the regulation. (*See, e.g.*, Village's Mem. at 15–16 ("Even if the FINS regulations," here

---

[16] Subsequent amendments to Section 7.20 instead cite Sections 100101, 100751, 320102(1) as the "citation authority" for Section 7.20 and do not cite any provisions within the FINS Act. *See, e.g.*, Fire Island National Seashore, Personal Watercraft Use, 70 Fed. Reg. 38759, 2005 WL 1551551, at *38767 (Jul. 6, 2005) (citing 16 U.S.C. §§ 1, 3, 9a, and 462(k)); *see also* ECF No. 51-4 (setting out the same statutory authority for Section 7.20).

referring to Section 7.20, are "found to be lawful, they nowhere authorize the treatment of construction debris differently from other refuse"); *id.* at 4–5 ("The [FINS] Act does *not* authorize the Secretary or his subdelegate, the FINS Superintendent, to promulgate regulations or restrictions governing the use of motor vehicles . . .") (emphasis in original).)

Notwithstanding the lack of precision in the Village's claim that the challenged agency action exceeded Defendants' authority as delegated by Congress, Defendants *also* fail to address the Organic Act as it relates here, in their opposition to Plaintiffs' motions and in support of their own cross-motion for summary judgment. (*See* Defs.' Mem. at 11–20.) As a result, much of Defendants' opposition to Plaintiffs' motions for summary judgment simply fails to respond to the Village's arguments on this claim.

For example, Defendants discuss at length specific provisions in Section 7.20, but the Village's argument is that the NPS lacked delegated authority from Congress to promulgate Section 7.20 in the first place. (*See* Defs. Mem. at 13–16.) Mistaking the Village's claim as one brought under the nondelegation doctrine, Defendants argue that the FINS Act does not unconstitutionally delegate Article I legislative powers, which are "vested" in Congress, to the Secretary. *See* Defs.' Mem. at 17–20; *see also Fed. Commc'ns Comm'n v. Consumers' Rsch.*, 606 U.S. 656, 672 (2025) (setting out the legal standards for bringing a constitutional challenge under the nondelegation doctrine). However, as the Village points out in reply, its motion for summary judgment argues that *Defendants lack statutory authority to regulate* motor vehicles on

the FINS Roadway, *not* that the *FINS Act conferred an unconstitutional delegation of legislative power to Defendants*. (Village's Reply at 10.)[17]

At oral argument, I provided the parties the opportunity to submit supplemental briefing on the issue of whether the Organic Act provides Defendants statutory authority to regulate motor vehicles on the FINS Roadway, including in the context of regulating the removal of construction debris from Fire Island. (Min. Entry, Jan. 22, 2026.)[18] In their supplemental briefing, the Village argues that *neither* the Organic Act nor the FINS Act authorize the regulation of motor vehicles on the FINS Roadway. (Village's Supp. Mem. at 5–15.) Defendants contend that *both* statutes provide adequate authority for them to have engaged in the challenged conduct. (Defs.' Supp. Mem. at 3.) Defendants are correct.

"It is well settled that an agency may only act within the authority granted to it by statute." *Nat. Res. Defense Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 108 (2d Cir. 2018) ("*NHTSA*"). The APA instructs courts to "hold unlawful and set aside agency action" that is "in excess of statutory . . . authority." 5 U.S.C. § 706(2)(C). "In reviewing the scope of an

---

[17] Indeed, the sole reference to the Organic Act in Defendants' summary judgment submissions is in the context of discussing an Eleventh Circuit decision rejecting a nondelegation challenge. (Defs.' Mem. at 19.) As noted, however, Plaintiffs do not bring a non-delegation claim.

[18] In its supplemental submission, the Village takes issue with my request for supplemental briefing. (Village's Supp. Mem. at 3 ("Despite the fact that Defendants have not heretofore argued that they have other statutory authority potentially applicable to this dispute, the Court has asked the parties to address whether . . . the Organic Act provide[s] Defendants with authority . . .").) As a "general rule," it is true that "[i]n our adversarial system of adjudication, [courts must] follow the principle of party presentation." *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020). However, courts may take a "modest initiating role" in certain circumstances, including by requesting supplemental briefing where, like here, it will narrow the issues and avoid invalidating federal regulations. *See id.* at 377, 381 (providing an addendum of cases in which the Supreme Court has called for supplemental briefing and describing examples in which such briefing was requested in order to narrow the issues or avoid invalidating federal regulations).

agency's authority to act, the question . . . is always whether the agency has gone beyond what Congress has permitted it to do." *NHTSA*, 894 F.3d at 108. Courts must "exercise their independent judgment in deciding whether an agency has acted within its statutory authority, . . . and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Loper Bright Enterprises et al. v. Raimondo*, 603 U.S. 369, 412–13 (2024). "[T]hat inquiry must be shaped, at least in some measure, by the nature of the question presented—whether Congress in fact meant to confer the power the agency has asserted." *W. Virginia v. EPA*, 597 U.S. 697, 721 (2022).

In "extraordinary cases" in which the "history and breadth of the authority that the agency has asserted and the economic and political significance of that assertion" provide reason to "hesitate before concluding that Congress meant to confer" claimed authority, courts look skeptically upon sweeping delegations of congressional authority. *Id.* Such questions fall within the major questions doctrine, and the agency must point to "clear congressional authorization" for the power it claims. *Id.* at 721, 723. ("[Courts] presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies").

However, "[i]n the ordinary case, that context has no great effect on the appropriate analysis." *Id.* at 721. In such cases, the Second Circuit directs that courts consider the "plain terms and purposes" of the authorizing statute to determine whether it authorized the agency's action. *Id.* ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). Courts are also guided by "common sense as to the manner in which Congress would have been likely to delegate." *W. Virginia*, 597 U.S. at 722–23 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)).

The application of these principles here is straightforward. Ordinary principles of statutory interpretation—not the major questions doctrine—apply to assess the Village's claim that the challenged agency action—whether construed as the Secretary's regulation of motor vehicle use on the FINS Roadway or his regulation of the removal of sanitation such as construction debris over the FINS Roadway—exceeded the limited authority Congress delegated to Defendants. (Village Mem. at 5.) The Village is "comprised of approximately 425 residential homes" and has a population of 33 year-round-residents and an estimated 3,000 seasonal residents and guests. (First Posillico Decl. ¶¶ 4, 16.) As of 2014, Fire Island as a whole had a seasonal population of between 12,000 and 16,000 people and approximately 500-year-round residents. (AR. 221.) Regulations governing motor vehicle transportation through the FINS Roadway, including the regulation of transportation for the purpose of "[s]anitation or refuse removal" in order to support the "continued use of residences on the Island," 6 C.F.R. § 7.20(a)(1)(x), do not come close to the "economic and political significance" of the "extraordinary cases" governed by the major questions doctrine. *W. Virginia*, 597 U.S. at 721 (considering a challenge to a portion of the Clean Power Plan); *Alabama Assn. of Realtors v. Dep't. of Health and Human Servs.*, 594 U.S. 758, 762–766 (2021) (considering a challenge to the Biden administration's nationwide eviction moratorium). The Village therefore improperly relies on cases applying the major questions doctrine in support of its claim that Defendants carried out the challenged conduct by acting outside of the authority that Congress delegated to them. (*See* Village's Supp. Mem. at 10–11; Village's Mem. at 2.)

Considering the "plain terms and purposes" of the Organic Act, Congress delegated to the Secretary the authority to make rules regulating motor vehicle travel on the Seashore lands. *W. Virginia,* 597 U.S. at 721. As explained, the NPS "has *broad authority* under the National Park

Service Organic Act . . . to administer both lands and waters within *all system units* in the country," including the FINS. *Sturgeon*, 587 U.S. at 38 (emphasis added); *D'Arienzo*, 2024 WL 36983, at *1. Section 7.20 was promulgated pursuant to NPS's broad rulemaking authority to "prescribe such regulations as the Secretary considers *necessary or proper for the use* and management of System units," 54 U.S.C. § 100751(a) (emphasis added), including the FINS, because regulating motor vehicle traffic, including by limiting the transportation of construction debris by truck, plainly minimizes the potential degenerative impact of such traffic on the Seashore. *See D'Arienzo*, 2024 WL 36983, at *3 ("Maintaining minimal road traffic on Fire Island was a priority from FINS's inception."); *Matherson*, 367 F. Supp. at 781–82 (holding that the vehicle permits issued pursuant to Section 7.20 protect against erosion of Seashore lands).

The promulgation of Section 7.20 was also consistent with the NPS's "fundamental purpose" to "conserve the scenery, natural and historic objects and wild life . . . in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a). It also advances the FINS's purpose of "conserving and preserving . . . undeveloped beaches, dunes, and other natural features" within Seashore lands. 16 U.S.C. § 459e(a). Because the Superintendent is tasked with issuing no more than 30 public utility and essential service vehicle permits under Section 7.20(a)(8)(ii)(D), the Superintendent possessed authority under Section 7.20(a)(1)(x), (4), (5)(iii), (6) to issue the 2024 and 2025 Essential Service Permits to the Wetherall Plaintiffs. The Original Determinations interpret the terms of those Permits, provide guidance as to how Section 7.20 will be enforced, and were issued in accordance with Section 7.20. *See infra*, Discussion § II.C.

The Village makes several arguments to the contrary, none of which are persuasive. First, the Village argues that interpreting the term "use and management of the System units" to

include the authority to regulate motor vehicle travel and waste disposal violates the interpretive canon of expressio unis and would render provisions in the Organic Act and the FINS Act surplusage. (Village's Mem. at 5–6.) Specifically, the Village argues that Congress expressly delegated rulemaking authority to the Superintendent over zoning, hunting, and fishing in the FINS Act and over mining, boating, grazing of livestock, and solid waste disposal sites located on park land in the Organic Act. (Village's Mem. at 5; Village's Supp. Mem. at 7–8.) According to the Village, these grants of rulemaking authority would be surplusage if the authority to make rules necessary or proper for the use and management of System units conveyed by Section 100751 of the Organic Act is understood to have granted the Superintendent broad "all-encompassing" rulemaking authority with respect to NPS System units. (Village's Supp. Mem. at 8.)

But the Village misunderstands how those provisions fit within the statutory structure of the Organic Act and the FINS Act. Under the expressio unius canon, "expressing one item of an associated group or series excludes another left unmentioned" where "circumstances support a sensible inference that the term left out must have been meant to be excluded." *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017). As explained, Section 459e-6(a) of the FINS Act provides that the Secretary shall "administer and protect" the FINS, "guided by . . . the applicable provisions of the *laws related to the national park system*," and makes clear that the Secretary may "utilize *any other statutory authority* available to him for the conservation and development of natural resources." 16 U.S.C. § 459e-6(a), (c) (emphasis added). Such "other statutory authority" necessarily includes Section 100751(a) of the Organic Act, which delegates general rulemaking power to the Secretary. Thus, the Secretary's authority to regulate motor vehicle travel is not left out of a list of enumerated powers within the Organic Act and the FINS Act.

Rather, it arises from an express grant of rulemaking authority set forth in both Section 100751(a) and Section 459e-6. Moreover, the statutory provisions on which the Village relies do not appear in a "group or series" together. 580 U.S. at 302. They appear in scattered statutory provisions in two different titles of the United States Code.

Likewise, construing Section 100751(a) broadly, as the Supreme Court recognized in *Sturgeon*, does not render the various provisions on which the Village relies surplusage because those provisions augment rather than subtract from the Secretary's rulemaking authority. 587 U.S. at 38. For example, the provisions within the FINS Act addressing zoning, hunting, and fishing are not intended to enumerate the scope of the Secretary's rulemaking powers but instead, as explained, provide rulemaking authority for *carrying out* duties imposed on the Secretary *by the FINS Act*. *See, e.g.*, 16 U.S.C. § 459e-2(a) (authorizing the Secretary to "issue [zoning] regulations" for "carry[ing] out" the acquisition of property, as directed by 16 U.S.C. § 459e-1(a)), *id.* § 459e-4 ("permit[ting] hunting, fishing, and shellfishing" in the FINS, except where the Secretary designates otherwise). The same is true of the provisions within the Organic Act on which the Village relies, which pertain to solid waste disposal and livestock grazing. *See, e.g.*, 54 U.S.C. § 100903 (prohibiting the operation of solid waste disposal sites on System units and providing the Secretary with accompanying authority to prescribe regulations "to carry out this section"); *id.* § 102101 (limiting the leasing and granting of "privileges" in System units with the exception that the Secretary may prescribe certain regulations to "grant the privilege to graze livestock within a System unit").[19]

[19] The remaining two provisions cited by the Village do not accompany similar obligations imposed on the Secretary, but they augment or clarify the Secretary's rulemaking authority. The rulemaking provision relating to mining goes beyond authorizing rulemaking with respect to the

Regardless, the "canon against surplusage is subordinate" to the plain meaning of a statute, and here the plain meaning of Section 100751 confers broad rulemaking authority to the Secretary to "prescribe such regulations as the Secretary considers *necessary or proper for the use* and management of the Seashore lands." 54 U.S.C. § 100751(a) (emphasis added); *U.S. Postal Serv. v. Konan*, 607 U.S. 391, 393 (2026); *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013) (a phrase "would not be superfluous if Congress included it to remove doubt" that a certain outcome is permissible); A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts*, 176–77 (2012) (superfluity canon "can be appropriately discounted" where the drafter engaged "in the ill-conceived but lamentably common belt-and-suspenders approach").

The Village's remaining arguments are similarly unpersuasive. It argues that Congress must "enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power and the power of the Government over private property." (Village's Supp. Mem. at 11 (quoting *United States Forest Service v. Cowpasture River Preservation Assn.*, 590 U.S. 604, 621–22).) However, the Village did not raise this argument in its motion for summary judgment; rather, it advances it for the *first time* only in its supplemental brief to the Court following oral argument. (*See* Village's Mem. at 2–10.) Moreover, this argument is outside the scope of my Order permitting the parties to address in supplemental briefing whether the challenged agency conduct was an exercise of the rulemaking powers delegated to the

---

"use and management" of System units to provide the Secretary with rulemaking authority over "all activities resulting from the exercise of mineral rights . . . within any System unit." 54 U.S.C. § 100732. The rulemaking provision related to boating and waterborne activities provides that the Secretary "may prescribe regulations under [Section 100751(a) (the general rulemaking provision)] concerning boating and other activities on or related to water." 54 U.S.C. § 100751(b).

Secretary under the Organic Act and whether the January 7, 2025 Determination is subject to NEPA. (Elec. Order, Jan. 22, 2026.) Accordingly, I need not consider it.

However, even if I do consider this argument, it is unpersuasive because Section 7.20 and the Original Determinations regulate driving on *federal land* over which Congress has plenary power. *California Coastal Comm'n*, 480 U.S. at 580. The fact that Section 7.20 and the Original Determinations may impact the Village does not mean they alter the balance between federal and state power or the power of the government over private property. The Village relies on *United States Forest Service v. Cowpasture River Preservation Association* for the proposition that Congress must use "extraordinarily clear language" when it alters the balance between federal and state power, but that case is distinguishable. 590 U.S. 604, 622 (2020). There, the Supreme Court held unlawful a delegation that would have resulted if the NPS were to "administer[] the thousands of miles of land" crossed by federal trails, including land owned by States, local governments, and private landowners. 590 U.S. at 621 n.6. Here, although Section 7.20 affects Plaintiffs' activities on municipal land, Section 7.20 only regulates the use of vehicles on *federal* land—specifically, the FINS Roadway.

Finally, the Village argues that the Original Determinations do not serve to protect the natural features of the Seashore. The FINS Roadway, they posit, is an "extremely limited use roadway, in a national seashore area where only a miniscule number of driving permits . . . are issued." (Village's Supp. Mem. at 12–13.) Based on this reasoning, Plaintiffs argue that the Superintendent lacked statutory authority to issue the Original Determinations, which do not advance the statutory purpose of the Organic Act or the FINS Act. (*Id.*) However, as addressed above, courts have repeatedly recognized that the regulation of motor vehicle use on the Seashore has been a priority from the "FINS's inception." *D'Arienzo*, 2024 WL 36983, at *1, 3

("To minimize the impact that vehicles have on protected Seashore land, FINS may issue only a finite number of driving permits . . . ."); *Matherson*, 367 F. Supp. at 782. ("The Fire Island National Seashore was established in 1964 for the purpose of conserving and preserving certain unspoiled and undeveloped beaches located on Fire Island. . . .").

Accordingly, summary judgment is granted to Defendants and denied to the Village on the Village's APA claim that Section 7.20 and the Original Determinations exceed the authority delegated to Defendants by Congress.

B. Arbitrary and Capricious Agency Action

An agency's decision is arbitrary and capricious only if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Am. Cruise Lines v. United States*, 96 F.4th 283, 286 (2d Cir. 2024). "The record must show that the agency . . . examine[d] the relevant data and articulate[d] a satisfactory explanation for its action," revealing "a rational connection between the facts found and the choice made." *Nat. Res. Def. Council v. EPA*, 658 F.3d 200, 215 (2d Cir. 2011) ("*NRDC*"). "Under this deferential standard of review," a court "may not substitute [its] judgment for that of the agency," *XY Planning Network, LLC v. U.S. SEC*, 963 F.3d 244, 255 (2d Cir. 2020), nor should it "engage in an independent evaluation of the cold record . . . ." *Guan v. Gonzalez*, 432 F.3d 391, 394–95 (2d Cir. 2005). However, the court also "may not supply a reasoned basis for the agency's actions that the agency itself has not given." *Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d at 540 (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 50 (1983)). "Counsel's *post hoc* rationalizations for agency action are not a valid basis to uphold such action." *Id*.

"The requirement of reasoned decisionmaking is heightened where the agency's decision is a departure from prior practice" *Metro. Transp. Auth. v. Duffy*, No. 25-cv-1413, 2026 WL 588117, at *42 (S.D.N.Y. Mar. 3, 2026). Indeed, "[w]hen an agency changes course" it is arbitrary and capricious for the agency to ignore the consideration that "longstanding policies may have engendered serious reliance interests." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020). Thus, an agency must "determine whether [reliance interests] were significant, and weigh any such interests against competing policy concerns . . . ." *Id.* at 33.

The plaintiff "bears the burden of showing that an agency's actions are arbitrary and capricious by citation to evidence in the administrative record." *D'Arienzo*, 2024 WL 36983, at *9. A court will uphold an agency's factual findings if they are "supported by reasonable, substantial and probative evidence in the record . . . ." *Ojo v. Garland*, 25 F.4th 152, 159–60 (2d Cir. 2022) (considering standard for assessing fact finding in immigration cases); *see also D'Arienzo*, 2024 WL 36983, at *8 (adopting same standard in APA challenge to the FINS motor vehicle regulations). "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the administrator and requires more than a scintilla but less than a preponderance." *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 141 (2d Cir. 2010). "[T]he agency need not provide written findings about every piece of evidence that it considers." *Kakar v. United States Citizenship & Immigr. Servs.*, 29 F.4th 129, 132 (2d Cir. 2022). However, an agency's factual findings must be supported by "a certain minimum level of analysis . . . as well as some indication that the [agency] considered material evidence." *Ojo*, 25 F.4th at 159–60; *see also D'Arienzo*, 2024 WL 36983, at *8.

Here, Plaintiffs argue that Defendants engaged in arbitrary and capricious action in issuing the Original Determinations, which allegedly set forth unsupported factual findings,

interpretations of terms in 36 C.F.R. § 7.20 and the Wetherall Plaintiffs' 2024 Essential Service Permits, and the immediate prohibition on the removal of construction debris by land over the FINS Roadway. First, Plaintiffs contend that the Original Determinations contain the arbitrary and capricious factual findings that "construction waste can be removed by waterborne transportation." (Village's Mem. at 1, 17.) Second, Plaintiffs claim that the Original Determinations set forth interpretations of terms in 36 C.F.R. § 7.20 and the Wetherall Plaintiffs' 2024 Essential Service Permits that are arbitrary and capricious. Specifically, they challenge the Superintendent's interpretation that: (1) the "[s]anitation or refuse" authorized for removal by truck over the FINS Roadway pursuant to 36 C.F.R. § 7.20 excludes construction debris, and (2) the "municipal solid waste" referenced in the Wetherall Plaintiffs' 2024 Essential Service Permits excludes "construction debris." (*Id.* at 16–17; Village's Reply at 20–22.) Third, Plaintiffs challenge as arbitrary and capricious the immediate prohibition set forth in the Original Determinations on Plaintiffs' removal of "'construction debris' from the Village by any means other than 'waterborne transportation.'" (Village's Mem. at 1, 9; AR. 131.)

"Generally, a court reviewing an agency decision is confined to the administrative record compiled by that agency when it made the decision." *Safe Haven*, 130 F.4th at 324. However, the Second Circuit has recognized three "limited" circumstances in which it "may be appropriate" for a court to review extra record evidence:

> The first is when there has been a strong showing in support of a claim of bad faith or improper behavior on the part of agency decisionmakers. The second is where the absence of formal administrative findings makes such investigation necessary in order to determine the reasons for the agency's choice. The third is when the district court need[s] to supplement the record with background information in order to determine whether the agency considered all of the relevant factors.

*Id*. (internal citations and quotation marks omitted).

The second and third circumstances recognized in *Safe Haven* apply here. Defendants have not highlighted any formal administrative findings in the record relating to the issuance of the Original Determinations. Without such findings, background information is necessary "in order to determine whether [the FINS] considered all of the relevant factors" in issuing the Original Determinations. *Safe Haven*, 130 F.4th at 324. I therefore consider both the administrative record and the evidence submitted by the Village, specifically the declarations of Village Administrator Mario Posillico (ECF Nos. 44-1, 52-1.), to determine whether Defendants' factual findings are supported by reasonable, substantial, and probative evidence in the record.[20] Considering the record as a whole, the Original Determinations and their accompanying factual findings, interpretations, and restrictions were arbitrary and capricious for two reasons.

First, Defendants failed to consider Plaintiffs' reliance interests, to determine whether such interests were significant, and to "weigh any such interests against competing policy concerns," *Regents*, 591 U.S. at 33, in issuing the Original Determinations, which immediately prohibit Plaintiffs' removal of construction debris from the Village over the FINS roadway. The Village has contracted with Wetherall Carting since 1969 to dispose of its construction debris and has trucked that construction debris over the FINS Roadway for more than 55 years, up to the present day. (First Posillico Decl. ¶ 3(a)–(b).) Defendants have not identified any evidence in the administrative record to the contrary. Moreover, during the January 20, 2026 oral argument, when asked about whether Defendants considered Plaintiffs' reliance interests, Defendants' counsel replied: "I don't know -- have an answer for your Honor. And we certainly didn't brief it." (Tr. 73:13–74:21.) Moreover, the 2011 Volpe Study actually corroborates Posillico's factual

[20] Defendants have not objected to consideration of the Posillico declarations. (*See generally* Defs.' Mem., Defs.' Reply.)

statements by documenting that, in 2011, the Village could not "haul[] garbage off the Island by Barge" until one of the walks was restructured, which was "many years away," and by noting that communities "with capacity to handle heavy equipment" had "expressed reluctance or unwillingness to allow other communities to use their [barging] facilities." (AR. 254.)[21] Since 2011, the Superintendent has repeatedly altered the language used in Wetherall's Essential Service Permits, authorizing the company to transport over land "sanitation and refuse" in 2015 (AR. 697), "municipal solid waste" in 2016 (AR. 695), and materials for construction in 2018 (AR. 688), all before settling on the formulation that Wetherall is authorized to transport "municipal solid waste," which has been in the Wetherall Plaintiffs' Essential Service Permits since 2019. (*See* Background § II.) Because Section 7.20 does not define "municipal solid waste," and Defendants do not identify anything in the Administrative Record (other than the permits) that does, it is not clear whether the Original Determinations actually revised Defendants' interpretation of the term "municipal solid waste" or whether Defendants always understood the term to exclude construction debris but simply did not enforce this understanding until issuing violations to the Wetherall Plaintiffs' drivers in September 2024 and January 2025. The notes from the Superintendent's November 2024 meeting with the Village reflect the FINS's

[21] For this reason, Defendants' argument that "many Fire Island communities take advantage of barging services to dispose of both municipal solid waste and construction debris" does not show that Defendants engaged in reasoned decisionmaking in issuing the Original Determinations and corresponding interpretations of Section 7.20 and the 2024 Essential Service Permits. (Defs.' Mot. at 25.) Although Defendants point to evidence that other communities on Fire Island barge construction debris, there is no evidence that those communities are willing to allow the Village to use their facilities. Moreover, the Volpe Study found that, at least in 2011, there was "reluctance or unwillingness" of other communities to allow the Village to use their barging facilities. (AR. 254.) Nor have Defendants shown that construction debris may be transported from the Village to those other communities overland such that it may then be transported off of Fire Island by barge.

position that the agency's interpretation of "municipal solid waste" to exclude construction debris was "not a new initiative" and that law enforcement do not conduct random stops. (AR. 123.) But a 2014 email in the record reflects that Wetherall had been previously allowed to cart construction debris over land as long as it was "confined to before 9:00 a.m." (AR. 13.) Therefore, Defendants have not shown any "rational connection between the facts found and the choice made" to either adopt the new term "municipal solid waste" starting in 2019 or to begin enforcing a preexisting interpretation of the term "municipal solid waste" in 2024. *NRDC*, 658 F.3d at 215.

Defendants argue that the Superintendent's issuance of permits "since at least 2020" reflects an understanding that "construction debris" was not included in the term "municipal solid waste" as used in Essential Service Permits. (Defs.' Mem. at 21.) Defendants rely on the permits issued by the Superintendent to other carters, which reflect that some carters were authorized to transport "municipal solid waste," others "construction debris," and still others, to transport both. (*Id*. at 21–22 (collecting permits).) Defendants argue that this shows that the Superintendent considered "construction debris" and "municipal solid waste" to be two separate terms. (*Id.*) However, irrespective of the text set forth in any permits issued to other carters operating on Fire Island, the record reflects that the Wetherall Plaintiffs were allowed to transport construction debris over land since at least 2015 and up until 2024. (*See* Background § II; Posillico Decl. ¶ 35–38.) Thus, the record establishes that the Village has a reliance interest in arranging for the transport of construction debris by truck over the FINS Roadway. These reliance interests include the burden that a transfer and barging operation would impose on the Village, which would necessarily require processes to secure approvals, including but not limited to studies and public engagement, "none of which is guaranteed to be granted." (Posillico Decl.

¶ 38.) Moreover, as addressed above, Defendants have not identified any evidence that the Superintendent relied on "a reasoned basis . . . ." that included consideration of such reliance interests weighed against any competing policy concerns when setting forth his interpretation in the Original Determinations that the term "municipal solid waste" as used in the Wetherall Plaintiffs' 2024 Essential Service Permits excludes construction debris. *Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d at 540. Nor is there any evidence in the record that Defendants engaged in any reasoned basis in changing that interpretation prior to Superintendent Romero's issuance of the Subsequent Determination to Mayor O'Brien and the Wetherall Plaintiffs less than two weeks before Defendants' August 4, 2025 deadline to file their cross-motion for summary judgment and opposition to Plaintiffs' pending summary judgment motions. (*See supra* Background §§ IV, V.)[22]

Second, the Superintendent's issuance of the Original Determinations was arbitrary and capricious because these letters set forth Defendants' conclusion that the Wetherall Plaintiffs can remove the Village's construction debris by barge off of Fire Island even though there is no evidence that Defendants conducted any analysis to reach such a conclusion. Although the agency need not provide written findings about every piece of evidence in the record, *Kakar*, 29 F.4th at 132, here Defendants have provided nothing to show that the Superintendent conducted

---

[22] Defendants also rely on a May 2014 email exchange between Posillico and a FINS staff member in which the FINS staffer advised that construction debris had to be barged and treated construction debris differently from municipal solid waste. (AR. 13; *see also* AR. 16 (separately referring to municipal solid waste and construction debris).) However, this email does not establish that the Wetherall Plaintiffs were actually required to barge anything or that they ever did so. Defendants claim that Waters knew he could not transport construction debris over the FINS Roadway but was "intentionally ignoring and violating Section 7.20 for years." (Defs.' Mem. at 22, n.6.) However, this is belied by the record. (*See supra* Background § III.) Moreover, "[c]ounsel's *post hoc* rationalizations for agency action are not a valid basis to uphold such action." *Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d at 540.

even a "minimum level of analysis in reaching such a conclusion," *Ojo*, 25 F.4th at, 159–60. The 2011 Volpe Study found that "most walks in the Village cannot accommodate" heavy equipment and that the Village's "long-term goal of hauling construction off of the Island by barge . . . cannot be realized until Broadway (the main north-south walk) is restructured, which may be many years away." (AR. 254.) There is no evidence in the record that Defendants ever made updated findings into the capabilities of the Village's dock and Broadway, or that it relied on such findings in issuing the Original Determinations. (*Id.*)[23]

Likewise, Defendants make a curious argument that photographs in the record depicting construction materials purportedly on the Village dock "beg[] the question: if large, heavy construction material can be imported to Fire Island via barge through the Saltaire dock . . . , why can it not also be exported via barge through the same dock?" (Defs.' Mem. at 28 (citation omitted).) As a threshold matter, the photographs at issue plainly depict construction equipment on a sandy beach—not on the Village dock. (AR. 322.) Equally significantly, as the Village aptly points out, "after-the-fact rationalization for agency action is disfavored" and not a valid basis for upholding challenged agency action. *Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 81 (2d Cir. 2006); *L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 619 (S.D.N.Y. 2018); Village's Reply at 23. Further, the photographs have no bearing on Plaintiffs' APA claims against arbitrary and capricious agency action because Defendants fail to show (1) that any of the photographs were taken *before* the Superintendent issued the Original Determinations in December 2024 and

[23] Defendants speculate that any deficiencies in the Village's dock capabilities noted in the Volpe Study must have been remedied given that around fourteen years have passed since that study was issued in 2011. (Defs.' Mem. at 27.) However, such speculation is a post-hoc rationalization offered by Defendants and fails to show any reasoned analysis prior to the issuance of the Original Determinations.

January 2025, (2) that the construction equipment depicted in the photographs was transported to the Village by barge, and (3) that any capacity of the Village walks and dock to allow the transport of construction vehicles onto a sandy beach is dispositive of their ability to permit removal of the Village's construction debris from Fire Island by barge. Undated photographs without any explanation in the record as to when or where Defendants took the photographs, what the photographs depict, or how they call into question Plaintiffs' reliance interests concerning the overland transport of construction debris—not construction equipment—fail to support Defendants' position that they weighed any reliance interests against competing policy concerns or otherwise engaged in reasoned decisionmaking when issuing the Original Determinations' factual findings concerning the Village's ability to dispose of construction waste through waterborne transport.

Accordingly, Plaintiffs have met their burden to show that Defendants engaged in the following arbitrary and capricious conduct:

1) the factual findings set forth in the Original Determinations that "construction waste can be removed by waterborne transportation" (AR. 131–32);

2) the interpretation that the term "municipal solid waste" in the Wetherall Plaintiffs' 2024 Essential Service Permits excludes construction debris from the material that may be transported over the FINS Roadway for disposal, and the corresponding interpretation that the term "[s]anitation or refuse" in 36 C.F.R. § 7.20(a)(1)(x)(B) as applied to the 2024 Essential Services Permits excludes construction debris (*id.*); and

3) the immediate prohibition on the Wetherall Plaintiffs' ability to remove construction debris from the Village by any means other than waterborne transportation as set forth in the Original Determinations (AR. 131, AR. 132).

C. <u>Not in Accordance with Law</u>

Plaintiffs claim that "[n]o regulations authorize treatment of [the term] 'construction debris' in a manner different from other debris and discarded materials." (Village's Mem. at 15.) As noted above, the Village at times makes this argument while addressing its claim that the

Original Determinations were arbitrary and capricious. (*See id.* at 18.) However, the Village also argues that the Superintendent's issuance of Essential Service Permits using the term "municipal solid waste" and issuance of the Original Determinations, which interpret this term as excluding "construction debris," were not authorized under Section 7.20. (*See id.* at 15–16 ("[E]ven if the FINS regulations are . . . found to be lawful, they nowhere authorize the treatment of construction debris differently from other refuse."); Tr. 39:20–25 (arguing that the "regulations themselves don't even authorize these restrictions that [Defendants have been] putting into play in permit language").) Specifically, Plaintiffs argue that Section 7.20 does not anywhere define the term "municipal solid waste" or "construction debris" and that the term "refuse" in 36 C.F.R. § 1.4 likewise does not include these terms. Village's Mot. at 16–17; *see id*. at 17 (arguing that neither the FINS nor NPS regulations define the terms "municipal solid waste" or "construction debris"); *see also* 36 C.F.R. § 1.4 (defining "refuse" to mean "trash, garbage, rubbish, waste papers, bottles or cans, debris, litter, oil, solvents, liquid waste, or other discarded materials"). Accordingly, I understand Plaintiffs to argue in this APA claim that the Superintendent set forth interpretations of the term "municipal solid waste" as used in the 2024 Essential Service Permits and the term "[s]anitation or refuse" as set forth in 36 C.F.R. § 7.20(a)(1)(x)(B) in a manner that was not in accordance with law.

In opposition, Defendants discuss several provisions within Section 7.20 and argue that the Superintendent considered the capabilities of the Village dock and the availability of carting and barging to remove the Village's construction debris. (Defs.' Mot. at 25–28.) However, these arguments relate to Plaintiffs' APA claims challenging the Original Determinations and the factual findings and interpretations set forth within them as arbitrary and capricious—not Plaintiffs' claim that the Superintendent issued the Original Determinations or reached the

challenged factual findings and interpretations in a manner that was "not in accordance with law."

The APA requires courts to "set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A). For "agencies charged with administering statutes, both their power to act and how they are to act is authoritatively prescribed by Congress." *New York v. Admin. for Child. & Fams.*, 833 F. Supp. 3d 361, 396 (S.D.N.Y. 2026) (citing *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013)). "It is well settled that an agency may only act within the authority granted to it by statute." *Nat. Res. Def. Council*, 894 F.3d at 108. While there is not one clear test to determine whether an agency's action is contrary to law, courts have deemed agency actions to be not in accordance with law where they conflict with or "depart[] from the framework" that a law "has long used to govern" a specific issue area. *Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d at 536 (finding that HHS's 'conscience rule' which allowed medical entities to abstain from certain medical procedures created standards that conflicted with those under Title VII and EMTALA and thereby violated the federal statutes). "The law does not permit an agency to regulate away rights and defenses which were granted by Congress." *Nat'l Treasury Emps. Union v. Cornelius*, 617 F. Supp. 365, 371 (D.D.C. 1985) (finding that an agency's attempt to revise statutory appeals process by deleting provisions of the code was not in accordance with law).

Plaintiffs have not met their burden to show that the Original Determinations and any factual findings and interpretations set forth within them are not in accordance with law in any way that is distinct from the finding that the Original Determinations are arbitrary and capricious. As noted above, the NPS regulates the operation of motor vehicles, seaplanes, and personal watercraft on the FINS lands and nearby waters under 36 C.F.R. § 7.20. The FINS is the

unit of NPS responsible for conserving and preserving the FINS lands and for enforcing Section 7.20. *D'Arienzo*, 2024 WL 36983, at *1. Pursuant to the plain text of Section 7.20, "[n]o motor vehicle . . . shall be operated on Seashore lands without a valid permit issued by the Superintendent," and the Superintendent may limit the number of permits for motor vehicles engaged in approved purposes under the regulation. 36 C.F.R. §§ 7.20(a)(4), (8). Section 7.20 provides that "essential service vehicles" are vehicles "other than a public utility vehicle" and "*may* include" vehicles for "[s]anitation or refuse removal." 36 CFR § 7.20(a)(1)(x) (emphasis added.) A separate subsection of Section 7.20 authorizes the Superintendent to impose additional limitations on Essential Service Permits as follows:

> Permits may contain such other limitations or conditions as the Superintendent deems necessary for resource protection, public safety, or visitor enjoyment. Limitations may include but will not be limited to, restrictions on locations where vehicle travel is authorized and times, dates, or frequency of travel, in accordance with the provisions of this paragraph (a).

36 CFR § 7.20(a)(9)(v).

Pursuant to these authorities, the Original Determinations, which include an interpretation of the term "municipal solid waste" as used in the Wetherall Plaintiffs' 2024 Essential Service Permits and, in a generous reading, an implied if cryptic interpretation of the term "[s]anitation or refuse" in 36 C.F.R. § 7.20(a)(1)(x)(B), does not "override[] . . . key components" of NPS, and are not "inconsistent" with the "framework" of NPS such that they are "not in accordance with the law." *Cf.* U*nited States Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d at 536; *Cornelius*, 617 F. Supp. at 371. Thus, Defendants are granted summary judgment on the Village's claim that the Original Determinations and the corresponding interpretations of the 2024 Essential Service Permits are not in accordance with law.

D. APA Notice and Comment Requirement

Plaintiffs claim that the Original Determinations constitute a "rule" under the APA, and that the Superintendent failed to provide "notice, publication and public comment, in violation of APA requirements" set forth in 5 U.S.C. 553(b)–(c) and 5 USC § 551(4). (Village's Mem. at 24.) According to the Village, "a determination establishing or revising limits on permits is necessarily deemed a 'rule' subject to the rulemaking requirements of the APA . . . ." (Village's Supp. Mem. at 18.) Defendants oppose Plaintiffs' request for summary judgment and move for summary judgment on the APA claims but fail to respond to the claim that the Original Determinations are subject to the APA's notice and comment requirements. (Defs.' Mot. at 32.)

"The APA divides agency action . . . into three boxes: legislative rules, interpretive rules, and general statements of policy." *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014) (Kavanaugh, J.). "The APA's requirement that general notice of proposed rule making shall be published in the Federal Register does not apply to 'interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice."' *Gonnella v. United States Sec. & Exch. Comm'n*, 954 F.3d 536, 546–47 (2d Cir. 2020) (quoting 5 U.S.C. § 553(b)(A)). "The central question is essentially whether an agency is exercising its rule-making power to clarify an existing statute or regulation, or to create new law, rights, or duties in what amounts to a legislative act." *Gonnella,* 954 F.3d at 546–47. "[P]olicy statements generally impact agency behavior rather than change the 'existing rights' of others outside the agency." *Id.*; *Fisher v. Aetna Life Ins. Co.*, 32 F.4th 124, 141 (2d Cir. 2022) ("A legislative rule grants rights, imposes obligations, or produces other significant effects on private interests, while an interpretive rule is an agency's intended course of action, its tentative view of the meaning of a particular statutory term, or internal house-keeping measures organizing agency activities.")

Thus,"[t]he central question is essentially whether an agency is exercising its rule-making power to clarify an existing statute or regulation, or to create new law, rights, or duties in what amounts to a legislative act." *Fisher*, 32 F.4th at 141–42.

Although Plaintiffs fail to address the distinction between legislative rules, interpretive rules, and general statements of policy, their argument boils down to the position that the Original Determinations are legislative rules subject to the APA's notice and comment requirements, rather than interpretive rules or statements of policy. Plaintiffs contrast Defendants' issuance of the Original Determinations with the "extensive record, evaluation and analysis conducted by Superintendent Romero, the FINS, and NPS in adopting a white-tailed deer management plan on Fire Island," where Defendants convened experts, studied alternatives, developed an environmental impact statement, and issued a final environmental impact statement and a Record of Decision. (Village's Mem. at 24 (citing *Friends of Animals v. Romero*, 948 F.3d 579 (2d Cir. 2020).)

Defendants' briefing fails to address this argument and to provide Defendants' position regarding whether the Original Determinations are legislative rules, interpretive rules, or general statements of policy. (*See* Defs.' Mem. at 1–35; Defs.' Reply at 1–5; Defs.' Supp. Mem. at 1–8); *see McCarthy*, 758 F.3d at 252 (considering the agency's "characterization of the guidance" in determining whether the action was a legislative rule, interpretive rule or general statement of policy).

Plaintiffs are mistaken in asserting that the Original Determinations were legislative rules requiring notice and comment. The Original Determinations serve to "clarify an existing . . . regulation"—specifically, Section 7.20—and the 2024 Essential Service Permits issued by the Superintendent pursuant to that regulation. *Fisher*, 32 F.4th at 141–42. They do not "create new

law" as required for a legislative rule. *Id.* Rather, the Original Determinations do two things. First, they make factual findings that construction waste can be removed by waterborne transportation and declare that "NPS will continue the strict enforcement of waterborne transportation for the removal of construction debris" (AR. 131–32), which together "explain[] how the agency will enforce" Section 7.20. *Noel*, 508 F.2d at 1030. Second, the Original Determinations interpret the term "municipal solid waste" to exclude "construction debris" as used in the Wetherall Plaintiffs' 2024 Essential Service Permits, which grants them permission "to travel across Fire Island National Seashore Lands for the sole purpose of transporting *municipal solid waste* off Fire Island." (AR. 132–33 (emphasis added).)

As addressed in the mootness analysis above, the Subsequent Determination suggests that the Original Determinations set forth an interpretation of Section 7.20 without pointing to any specific text in that regulation that was interpreted. (*See supra* Discussion § I.B.) The Subsequent Determination provides that:

> [G]oing forward, the current relevant terms and provisions of 36 CFR § 7.20 shall be interpreted to allow holders of Essential Service Permits (the "Permits") containing language that authorizes carters to travel across Fire Island National Seashore Lands 'for the sole purpose of transporting municipal solid waste off Fire island' to cart municipal solid waste, sanitation or refuse—including construction debris.

(Subsequent Determination.) Thus, the Subsequent Determination does not explicitly identify any "current relevant terms and provisions" of Section 7.20 that are being interpreted. Nevertheless, under a generous reading of the Subsequent Determination, it provides an implied, if obscure, interpretation that the regulation's reference to vehicles used for "[s]anitation or refuse removal," which fall within the definition of "essential service vehicles," include vehicles transporting construction debris. 36 C.F.R. § 7.20(a)(1)(x); *see supra* Discussion § II.A, B. Accordingly, the text of the Subsequent

Determination suggests that the Original Determinations set forth interpretative rules concerning the term "municipal solid waste" in the 2024 Essential Service Permits and the term "[s]anitation or refuse removal" in 36 C.F.R. § 7.20(a)(1)(x).

I need not determine whether the Original Determinations consist of interpretative rules, general statements of policy, or a mix of both, however, because all that is necessary to resolve Plaintiffs' request for summary judgment on the APA rulemaking claim is the determination that the Original Determinations are not legislative rules that must go through a notice and comment procedures. *See Gonnella*, 954 F.3d at 546 (requiring notice and comment only for legislative rules); *see* 5 U.S.C. § 553 (b) (setting forth the APA's notice and comment requirements for agency rulemaking and providing an exception for "interpretative rules, general statements of policy, or rules of agency organization, procedure or practice"). Here, it is clear that the Original Determinations are not legislative rules.

Accordingly, summary judgment is granted to Defendants on Plaintiffs' claim that Defendants failed to meet the APA's notice and comment requirements.

## III. National Environmental Policy Act Requirements

The Village's final claim is brought under the National Environmental Policy Act ("NEPA"). It contends that the Superintendent's issuance of the Original Determinations constitutes a new policy subject to NEPA's requirements, but that Defendants failed to consult with experts, study alternatives, or prepare any environmental impact statement ("EIS"). (Village's Mem. at 24–25; Village Supp. Mem. at 15–20.) As noted, in support of this claim, the Village compares the public process involving expert review and public consultation prior to Defendants' adoption of a white-tailed deer management plan to the lack of comparable expert analysis and public consultation prior to the issuance of the Original Determinations. (Village's

Mem. at 24.) However, the Village explicitly acknowledges that "mere annual renewals of Essential Permits themselves are not subject to NEPA review." (Village's Supp. Mem. at 15–16.) Defendants mistakenly interpret the Village to take the position that the renewal of an Essential Service Permit is subject to the NEPA requirements. (Defs.' Mot. at 28–33.) However, the Village acknowledges "the exclusion of annual permit issuing from the requirements of NEPA" and argues only that the issuance of the "[Original] Determination[s] establishing a new policy and practice which here would prohibit the Village from removing construction debris by waterborne transportation" are subject to NEPA's requirements. (Village Supp. Mem. at 15–16.)

NEPA requires that a federal agency "prepare an EIS before taking *any major action* 'significantly affecting the quality of the human environment.'" *Nat. Res. Def. Council, Inc. v. F.A.A.*, 564 F.3d 549, 556 (2d Cir. 2009) (emphasis added). "The term major federal action is not defined in the statute." *Duffy*, 2026 WL 588117, at *63 n.42. Accordingly, determining whether an agency action is a "major Federal action[]" significantly affecting the quality of the human environment often requires the court to "wade into cloudy waters." *Min. Pol'y Ctr. v. Norton*, 292 F. Supp. 2d 30, 54 (D.D.C. 2003). "Previously, courts looked to the definition contained in the regulations promulgated by the Council on Environment Quality," but it is not clear whether those regulations still govern this question. *Duffy*, 2026 WL 588117, at *63 n.42.

No party has provided any authority addressing whether agency action that is not a legislative rule, such as an interpretive rule or general statements of policy, is subject to NEPA's requirements. (Village's Mem. at 23–26; Village's Supp. Mem. at 15–20.) The Village has likewise failed to provide any authority on what constitutes "a major federal action" significantly

affecting the quality of the human environment that would trigger NEPA's requirement that the agency prepare an EIS. (*Id.*; Defs' Mot. at 28–31.)[24]

Because the Village fails to provide any legal authority supporting its position that the Original Determinations constitute a "major federal action" subject to the NEPA requirement to prepare an EIS, *Natural Resources Defense Council*, 564 F.3d at 556, it fails to show that it merits summary judgment on the NEPA claim. Similarly, Defendants fail to show that they merit summary judgment because they misinterpret the claim and simply argue that permit renewals are not subject to the NEPA EIS requirement despite the fact that the Village makes no such argument. Accordingly, summary judgment is denied to both parties on the NEPA claim.

## IV. Other Claims

Defendants move for summary judgment on the Wetherall Plaintiffs' tortious interference claims. (Defs.' Mem. at 33–34.) The Wetherall Plaintiffs' opposition to Defendants' motion entirely fails to respond. Accordingly, the Wetherall Plaintiffs have abandoned these claims, and summary judgment is granted to Defendants on the tortious interference claims. *See Bryant v. Steele*, 462 F. Supp. 3d 249, 270 (E.D.N.Y. 2020) ("A party abandons a claim in the context of a summary judgment motion when she does not respond to arguments concerning that claim.").

No party has moved for summary judgment with respect to the Wetherall Plaintiffs' claim under the Fifth Amendment Equal Protection Clause or request for a writ of mandamus. (Amend. Compl. ¶¶ 53–63.) Therefore, the parties shall meet and confer and file a status report

---

[24] Defendants argue only that the issuance of an Essential Service Permit is not a "major federal action" requiring a finding of no significant environmental impact under NEPA. (Defs.' Mem. at 28–31.)

with the Court by October 14, 2026 addressing whether the Wetherall Plaintiffs continue to pursue these claims.

## V. Remedy

Having granted summary judgment to Plaintiffs on their APA claims against arbitrary and capricious agency action, I must determine the proper remedy. Plaintiffs request the following relief:

> (1) that the Original Determinations "and any associated restrictions in the 2025 Essential Service Permits prohibiting the removal of constructing [sic] debris by vehicle across the FINS Roadway and mandating removal of same by waterborne transportation, should be declared null and void";
>
> (2) a declaratory judgment "confirming the Village's and Wetherall Catering's right to continue removing construction debris (and all other sanitation and refuse waste) from the Village by vehicle"; and
>
> (3) an injunction enjoining Defendants from "preventing the Village and its carter from [removing construction debris by vehicle], with the carter having the same rights and privileges that are applied to all other holders of essential service permits for the removal of sanitation and refuse."

(Village's Mem. at 2; Wetherall Mem. at 2, 7–8.)

"In the usual case, when an agency violates its obligations under the APA, [courts] will vacate a judgment and remand to the agency to conduct further proceedings." *Guertin v. United States*, 743 F.3d 382, 388 (2d Cir. 2014); *Duffy*, 2026 WL 588117, at *65. However, remand is not necessary "in rare circumstances" where a record would not change on remand and already has compelling evidence that the agency's action was unlawful. *Guertin*, 734 F.3d at 388; *see, e.g.*, *Duffy*, 2026 WL 588117, at *65 (holding that where the challenged action was based on a conclusion with respect to the agency's legal authority that "was an error of law," no amount "of further agency deliberation is necessary to decide Congress's authority" because this "question belongs to the courts").

"The Court has authority under the APA to enter a declaratory judgment where it has vacated the underlying agency action." *Duffy*, 2026 WL 588117, at *66 (citing *Refugee & Immigrant Ctr. For Educ. & Legal Servs. v. Noem*, 793 F. Supp. 3d 19, 105 (D.D.C. 2025)). The Declaratory Judgment Act vests federal courts with discretion, in a proper case, to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Courts are instructed to consider the following factors to the extent they are relevant:

> (1) whether the declaratory judgment sought will serve a useful purpose in clarifying or settling the legal issues involved (2) whether such a judgment would finalize the controversy and offer relief from uncertainty; (3) whether the proposed remedy is being used merely for procedural fencing or a race to res judicata; (4) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; (5) whether there is a better or more effective remedy; and (6) whether concerns for judicial efficiency and judicial economy favor declining to exercise jurisdiction.

*Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85, 99–100 (2d Cir. 2023); *Duffy*, 2026 WL 588117, at *66.

With respect to injunctive relief, "[t]he Supreme Court has cautioned that a district court vacating an agency action under the APA should not issue an injunction unless doing so would have a meaningful practical effect independent of its vacatur." *Duffy*, 2026 WL 588117, at *67 (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)). "An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co.*, 561 U.S. at 165.

Here, Defendants made the following arbitrary and capricious factual findings interpretations, and restrictions set forth in the Original Determinations:

1) the factual findings that "construction waste can be removed by waterborne transportation" (AR. 132–33);

2) the interpretation that the term "municipal solid waste" in the Wetherall Plaintiffs' 2024 Essential Service Permits excludes construction debris from the material that may be transported over the FINS Roadway for disposal, and the related interpretation that the term "[s]anitation or refuse" in 36 C.F.R. § 7.20(a)(1)(x)(B) as applied to the 2024 Essential Service Permits excludes construction debris (*id.*); and

3) the immediate prohibition on Plaintiffs' ability to remove construction debris from the Village by any means other than waterborne transportation (AR. 131).

Under the APA, courts are instructed to "hold unlawful and set aside" agency actions found to be "arbitrary, capricious, . . . or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Accordingly, I vacate the Original Determinations in their entirety along with Defendants' corresponding interpretations of the terms "municipal solid waste" in the Wetherall Plaintiffs' 2024 Essential Service Permits and the term "[s]anitation or refuse removal" in 36 C.F.R. § 7.20(a)(1)(x)(B) as applied to the 2024 Essential Service Permits. Plaintiffs are therefore restored to their position prior to issuance of the December 20, 2024 and January 7, 2025 Determinations.

The question remains as to whether the circumstances here present the "rare circumstance" in which no further deliberation is necessary and where the record would not change if remanded to the agency. *Guertin*, 734 F.3d at 388. Defendants have certified that they have provided "the complete Administrative Record, including true and correct copies of all relevant documents considered by the NPS in its decision/interpretation . . . ." (ECF No. 42-18.) Indeed, some of the information in the administrative record appears to have post-dated the Original Determinations, such as the undated photographs of construction equipment on sand, which Defendants describe as the Village's dock. (AR. 322; *see supra* Discussion § II.B.) Thus, this case presents a situation where a remand for further fact finding and investigation would not change the record for evaluating whether Defendants' factual findings and interpretations set

forth in the Original Determinations were arbitrary and capricious. Vacatur of these findings and interpretations affords Plaintiffs much, if not all, of the relief sought in their first request relief because it renders null and void the Original Determinations and any associated restrictions in the 2024 Essential Service Permits and the interpretation of the term "[s]anitation or refuse" in 36 C.F.R. § 7.20(a)(1)(x)(B) as applied to those permits. However, vacatur does not provide the requested declaration that "any associated restrictions in the 2025 Essential Service Permits prohibiting the removal of construction debris by vehicle across the FINS Roadway and mandating removal of the construction debris by waterborne transportation are null and void." As explained above, the issuance of the Subsequent Determination provides such relief because it interprets the term "municipal solid waste," as used in the Wetherall Plaintiffs' 2025 Essential Service Permits and any other current or future permits, to allow the transport of construction debris over the FINS Roadway. (*See* Discussion § I., III.)

With respect to Plaintiffs' remaining requests for declaratory and injunctive relief, no party has briefed the proper remedy, and it is not clear that Plaintiffs are entitled to the specific declaratory relief and injunctive relief sought.

First, with respect to the request for a declaratory judgment "confirming the Village's and Wetherall Catering's right to continue removing construction debris (and all other sanitation refuse and waste) by vehicle," such a declaration does not account for the fact that the Superintendent possesses statutory authority to regulate motor vehicle travel on the FINS Roadway under Section 7.20. *See* 36 C.F.R. 7.20(a)(4), (8); *see supra* Discussion § II.A, II.C. The issue resolved at this time is that the Superintendent unlawfully restricted Plaintiffs' ability to transport construction debris over the FINS Roadway through the Original Determinations—and their corresponding interpretations of the term "municipal solid waste" in the 2024 Essential

Service Permits and "[s]anitation or refuse" in 36 C.F.R. § 7.20(a)(1)(x)(B) as applied to the 2024 Essential Service Permits—without making a reasoned determination based on "examin[ination] [of] the relevant data," including consideration of Plaintiffs' reliance interests and the capabilities of the Village dock, and an "articulat[ion] [of] a satisfactory explanation for its action." *NRDC*, 658 F.3d at 215. Plaintiffs have not shown that the requested declaration would serve any useful purpose where the Court has vacated the Original Determinations and the interpretation of corresponding terms in Section 7.20 and the 2024 Essential Service Permits.

Second, Plaintiffs have not explained why they are entitled to an order permanently enjoining Defendants from "preventing the Village and its carter from [carting construction debris over the FINS Roadway], with the carter having the same rights and privileges that are applied to all other holders of essential service permits for the removal of sanitation and refuse" based on successful APA claims against arbitrary and capricious agency action. (Village's Mem. at 2.) Because Plaintiffs have not briefed the issue of remedies, they do not identify any specific rights and privileges that are applied to other holders of Essential Service Permits for removal of sanitation and refuse that should be extended to Plaintiffs as a result of Defendants' arbitrary and capricious conduct or the duration of any such injunction. (Village's Mem. at 2; Wetherall Mem. at 2, 7–8.) Furthermore, it is unclear whether an injunction is necessary here, where the Subsequent Determination provides that:

> [G]oing forward, the current relevant terms and provisions of 36 CFR 7.20 shall be interpreted to allow holders of Essential Service Permits (the "Permits") containing language that authorizes carters to travel across Fire Island National Seashore Lands 'for the sole purpose of transporting municipal solid waste off Fire Island' to cart municipal solid waste, sanitation, or refuse—including construction debris.

Subsequent Determination; *see Duffy*, 2026 WL 588117, at *67 (noting that an injunction is not necessary unless it "would have a meaningful practical effect independent of its vacatur" (quoting *Monsanto*, 569 U.S. at 165–66)).

I am aware that the Superintendent may, at any time, withdraw the Subsequent Determination. Thus, there may be "some basis for Plaintiffs' worry that injunctive relief is necessary . . ." *Duffy*, 2026 WL 588117, at *67. However, Plaintiffs have not made a sufficient showing to support permanent injunctive relief," *Duffy*, 2026 WL 588117, at *67, because Defendants represent that they intend to allow Plaintiffs to cart construction debris over the FINS Roadway and Plaintiffs have not provided legal authority supporting the issuance of a permanent injunction. (Subsequent Determination; Village's Mem. at 2, 25; Wetherall Mem. at 2, 7–8.)

Accordingly, at this time, the Court vacates the Original Determinations and their corresponding interpretations of the term "municipal solid waste" in the 2024 Essential Service Permits and the term "[s]anitation or refuse removal" in 36 C.F.R. § 7.20(a)(1)(x)(B). All other relief requested is denied without prejudice. The parties must meet and confer in good faith on the question of any additional remedies and submit to the Court a status report indicating whether they have reached agreement on any additional declaratory or injunctive relief.

**CONCLUSION**

For the reasons set forth above, the cross-motions for summary judgment filed by the Village (ECF No. 44), the Wetherall Plaintiffs (ECF No. 45), and Defendants (ECF No. 51), are granted in part and denied in part as follows.

Summary judgment is granted to Plaintiffs and denied to Defendants with respect to Plaintiffs' APA arbitrary and capricious claims, which are set forth in Count I of the Wetherall

Plaintiffs' Amended Complaint and Count II of the Village's Amended Complaint. (Wetherall Am. Compl. ¶¶ 42–52; Village's Am. Compl. ¶¶ 158–62.)

Summary judgment is granted to Defendants and denied to:

(1) the Village with respect to its claims that Defendants exceeded their statutory authority in engaging in the challenged conduct, which are brought under Counts I and V of the Village's Amended Complaint (Village's Am. Compl. ¶¶ 150–57, 178–92);

(2) Plaintiffs with respect to their claims that the Original Determinations were issued without notice and comment as required by the APA, as set forth in Count I of the Village's Amended Complaint and the Wetherall Plaintiffs' Amended Complaint (Village's Am. Compl. ¶ 156; Wetherall Am. Compl. ¶ 48);

(3) the Village with respect to its claim that the Original Determinations were issued in a manner not in accordance with the law in violation of the APA, as set forth in Count I of the Village's Amended Complaint (Village's Am. Compl. ¶ 156); and

(4) the Wetherall Plaintiffs with respect to their tortious interference claims, as set forth in Counts IV and V of the Amended Complaint (Wetherall Am. Compl. ¶¶ 59–72).

Neither the Village nor Defendants merit summary judgment with respect to the Village's claims that the Original Determinations were issued in violation of NEPA's requirements, as set forth in Count V of the Village's Amended Complaint (Village's Am. Compl. ¶¶ 178–92).

I vacate the Original Determinations and the corresponding interpretations that (1) the term "municipal solid waste" as used in the Wetherall Plaintiffs' 2024 Essential Service Permits excludes construction debris, and (2) that the term "[s]anitation or refuse removal" in 36 C.F.R. § 7.20(a)(1)(x)(B) as applied to the 2024 Essential Service Permits excludes construction debris. All other relief requested is denied without prejudice.

The parties must meet and confer in good faith and file a status report by October 14, 2026 indicating: 1) whether they have reached an agreement on any additional declaratory or injunctive relief in light of the rulings set forth in this Opinion and Order; 2) whether the Wetherall Plaintiffs continue to pursue claims under the Fifth Amendment Equal Protection

Clause and a request for a writ of mandamus; (3) whether the Village continues to pursue its NEPA claims.

Dated: Central Islip, New York

September 28, 2026

*/s/ Nusrat J. Choudhury*
NUSRAT J. CHOUDHURY
United States District Judge